Daniel DONNELLY, et al.

v.

Dennis LYNCH, et al.

Civ. A. No. 80–0669.

United States District Court,
D. Rhode Island.

Nov. 10, 1981.

Sandra Blanding, Warwick, R. I., for plaintiffs.

Maryfrances McGinn, City Sol., City of Pawtucket, Pawtucket, R. I., William F. McMahon, Providence, R. I., for defendants.

## OPINION AND ORDER *

PETTINE, Chief Judge.

The First Amendment of the United States Constitution begins, "Congress shall make no law respecting an establishment of religion." By incorporation through the Due Process clause of the Fourteenth Amendment, *Abington School District v. Schempp*, 374 U.S. 203, 215–16, 83 S.Ct. 1560, 1567–68, 10 L.Ed.2d 844 (1967), this prohibition against official support of, and affiliation with, religious philosophies and institutions applies as well to the actions of state and local governments. In this case, the Court must decide whether the City of Pawtucket's ownership and erection of a nativity scene as part of its annual Christmas display violates this fundamental restriction on governmental power.

The plaintiffs are the Rhode Island affiliate of the American Civil Liberties Union (ACLU), Daniel Donnelly, George Kriebel, Robert Goodwin and A. Gregory Frazier. George Kriebel is and has been a real estate tax paying resident of the City of Pawtucket since February 1980. Robert Goodwin is and has been a personal property tax paying resident of said city since 1976. A. Gregory Frazier is and has been a personal property tax paying resident of Pawtucket since 1980. Daniel Donnelly, the original plaintiff, has resided in Pawtucket for four years and is a registered voter there. (I,

---

* The Court wishes to express its deep appreciation to Professor Robert Destro of Marquette University School of Law, and Professor Ira Lupu, of Boston University School of Law, who appeared as *amici* in this case. Their scholarly briefs provided invaluable assistance to the Court in resolving the difficult and sensitive issues presented here.

7)[1] Although he is liable to Pawtucket for personal property taxes, he has failed to pay them. At all times pertinent to this case the plaintiffs have been members of the Rhode Island affiliate of the ACLU. The defendants are Dennis Lynch, mayor of Pawtucket at the inception of this case and during the Christmas, 1980, display;[2] Richard Mumford, the City's Finance Director and chief fiscal officer (II, 1–2); Guy Dufault, Director of Parks and Recreation and Supervisor of the planning and implementation of the Christmas display (I, 64–66); and the City itself.

This action was filed one week before Christmas, 1980. Plaintiffs initially sought a temporary restraining order requiring immediate removal of the creche from the City's holiday display. At a conference with the Court, the defendants stated their firm intention to continue to include the nativity scene in future Christmas displays.[3] Assured by this representation that the issue would not become moot, plaintiffs agreed to withdraw their request for emergency relief in order to permit the Court sufficient time to receive evidence and afford the case the deliberate consideration which the issues deserved. The case proceeded to trial on an accelerated schedule, with the parties agreeing that the Court would then render a final decision on the merits.[4]

In the course of trial, however, a serious question arose as to Mr. Donnelly's standing as a taxpayer. On August 31, 1981, the Court issued a "Tentative Opinion" holding that Mr. Donnelly lacked standing to litigate this case as a taxpayer. Counsel were advised that the Court was prepared to hear argument on this point. On October 15, 1981 the Court granted plaintiff's motion to amend the complaint to add the other present plaintiffs as parties. Through this motion the original plaintiff sought to remedy the absence of standing.

The filing and litigation of this case have generated an extraordinary outpouring of public comment in Pawtucket and surrounding communities. The facts are as follows:

Hodgson Park, the location of the Christmas display, is a privately owned open space area of approximately 40,000 square feet. (II, 81–82). Bounded by Roosevelt Avenue, Main Street, and Broadway, the Park lies in the heart of the downtown shopping district. (I, 90–91). The City's two largest retail establishments are within walking distance of the Park, as is City Hall. With the private owner's permission, the City enters Hodgson Park each year in November and erects a lighted Christmas display. (I, 65–66, 75).[5] City employees, or

---

1. Citations to the transcript in this case will take the form of a roman numeral designating volume and an arabic numeral designating page.
 "I" indicates the testimony given on February 3, 1981. "II" indicates the testimony given on February 5. The testimony given on February 6 is designated "III", although it is included in the same binding as that of the preceding day.

2. Dennis Lynch has been replaced by William F. Harty, Jr. as Mayor of Pawtucket. *See* note 3 *infra*.

3. This intention was reiterated at trial. (II, 53). Indeed, Mayor Lynch expressed his desire to have an even better looking creche next year. (*Id.*) The strength of the Mayor's commitment to maintaining the nativity scene if at all possible was manifest in his testimony. *See* II, 53–54, 63–65. While acknowledging his duty to abide by the constitutional rulings of the Court, the Mayor indicated his intention to "figure some other way to have a nativity scene as part of the historical tradition and part

of the full Christmas display." (II, 54). *See also* report of the "Good News" interview with Mayor Lynch in Plaintiff's Ex. 12 ("one way or another tradition like this is going to continue. No judge, no jury is going to undermine that.") On the admissibility and substantive accuracy of this newspaper account, *see* notes 14 & 15 *infra*. Since said hearing Mayor Lynch has resigned and has been succeeded by William F. Harty, Jr. A stipulation has been filed that Mayor Harty agrees with and adopts the position of former Mayor Lynch as stated in his testimony, but does not intend to make any additions or enlargements to the display.

4. The nativity scene thus remained part of Pawtucket's 1980–81 Christmas display.

5. In past years, the display was apparently located at another site further from the downtown area. Mayor Lynch testified that he was responsible for relocating the display in order to further assist the downtown revitalization efforts, but did not specify when the move had

city-paid contractors, perform the setup work. (I, 66, 70). The City owns the lights, figures, and buildings that make up the display, (I, 85–90); it reimburses the private owner for all the electricity used by the display. (I, 72). Subject to the final approval of the Director of Parks and Recreation, a City maintenance supervisor designs the layout of the display. (I, 66). The Mayor may make changes in the layout. (II, 52).[6]

The 1980–81 display contained the following:
- —a "talking" wishing well
- —Santa's House, inhabited by a live Santa who distributed candy
- —a grouping of caroler/musician figures in old-fashioned dress, standing on a low platform surrounded by six large artificial candles
- —a small "village" composed of four houses and a church
- —four large, five-pointed stars covered with small white electric lights
- —three painted wooden Christmas tree cutouts
- —a live, 40′ Christmas tree strung with lights
- —a spray of reindeer pulling Santa's sleigh, set on an elevated runway
- —a long garland hung from candy-striped poles
- —cutout letters, colored in fluorescent paint, that spell "SEASON'S GREETINGS"

- —21 cutout figures representing such varied characters as a clown, a dancing elephant, a robot and a teddy bear
- —the nativity scene at issue in this case

Also, small colored lights festooned the trees growing in and near the Park. A schematic of the display, prepared by the City,[7] has been filed with the Court.

To visualize the layout of the display, some physical description of the Park is necessary. The Park is roughly bisected by the Blackstone River. (I, 90). The East half rises in a moderate slope to Broadway Street. The West half is bounded by Roosevelt Avenue, a main thoroughfare, and Main Street; it is on this half that most of the display is placed. On this perimeter of the Park, there are four bus stops, two of which have shelters. Two sets of stairs lead down into the Park from the Roosevelt Avenue sidewalk. Persons standing at the bus stops and walking along that sidewalk would have the best view of the display. (I, 114–15).

The nativity scene occupies the foreground of the display. The stable opens towards Roosevelt Avenue and all the figures are visible from that side. Looking down into the Park from the bus stops, the wishing well and Santa's House appear on the extreme left of the nativity scene. Behind and above the creche loom Santa's sleigh and reindeer. To the right of the creche are the live Christmas tree, the small "village," and the carolers, which face Roosevelt Avenue. (I, 94).[8]

taken place. (II, 53, 78). No evidence was offered about the public or private character of the former site.

**6.** The Mayor testified that he had in fact made changes in the display in the past. (II, 52). He did not elaborate on the substance or timing of these alterations, or on the reasons for which they were made. *But see* newspaper clippings in Pl.Ex. 12 stating that Mayor has responded to ACLU's annual complaints about creche by "beefing up" the display.

**7.** The plaintiffs have received copies of this drawing and do not object to it. Based on trial testimony, various photographs offered as exhibits, and the Court's own view of Hodgson Park (taken after the display had been re-

moved), the drawing appears to be an accurate approximation of the scene.

**8.** The Court does not mean to imply by this description that all the elements of the display are fully visible to persons standing at all points on the Roosevelt Avenue perimeter of the Park. As the defendants painstakingly pointed out at trial, what one sees of the display obviously depends to some degree on where one is standing. It is abundantly clear to the Court, however, that the optimal vantage point is the Roosevelt Avenue bus stop area, and that the elements of the display are deliberately placed so that persons standing in that area or entering the Park from the Roosevelt Avenue access steps are seeing the "front" of the display.

The figures in the nativity scene are approximately life sized. (I, 101–02).[9] They include kings bearing gifts, shepherds, animals, angels, and Mary and Joseph kneeling near the manger in which the baby lies with arms spread in apparent benediction. All of the figures face the manger in which the baby lies; several have their hands folded and/or are kneeling. The figures' poses, coupled with their facial expressions, connote an atmosphere of devotion, worship, and awe. The stable is, inexplicably, shored up with two hockey sticks. Some of the figures are chipped, and the paint on several is peeling.

The nativity scene was purchased by the City in 1973 for $1,365. (I, 71–72). No money has since been expended on its maintenance. (*Id.*) This amount was comparable to that expended to purchase the three other large groupings—the carolers, the "village", and Santa's sleigh—that are part of the current display. The creche is assembled, removed, and stored by City workers; these tasks take a total of two worker-hours. (I, 67–68). Some additional time is spent by the City electrician in hooking up two spotlights to shine on the nativity scene. (I, 69). The Parks Director estimated that of the $4,500 spent for these employee services, about $20 was attributable to the creche. (I, 85). The City also spent a small amount, probably under $20, for spotlights, bulbs and holders to light the creche, (I, 78–79) and Pl.Ex. 7, and some unspecified sum for the electricity these use. (I, 72).

When the Hodgson Park display is opened, ceremonies at the Park are held in conjunction with those at City Hall, 300 feet away. Santa arrives at the Park in a City fire truck. He and the Mayor throw a switch, illuminating the lights at the Park and City Hall. Santa then goes to his House in the Park and distributes candy to the children. The "talking" wishing well also begins operation. The sound system that broadcasts Christmas carols through the Park is the same one used at City Hall (I, 102, 104).[10]

During the trial of this case the Court received testimony from several individuals. This testimony bore on the purpose and the effect on viewers of Pawtucket's nativity scene and also on any political divisiveness that erection of the creche has caused. The Court will now summarize this testimony.

Plaintiff Donnelly testified that he first saw the Hodgson Park display, including the nativity scene in December, 1980. (I, 8, 10, 20). He stated that he viewed the creche as a religious display depicting the birth of Christ, and that he knew that it was sponsored by the City. (I, 11–14, 29). Perceiving this as a demonstration of official support for a particular religious viewpoint, which ran contrary to his strong belief in the separation of church and state, Mr. Donnelly testified that his reaction was one of fear. (I, 11–13). He explained that he regarded the City's use of the nativity scene as exemplifying an increasing tendency of various religious groups to become more political and thereby to impose their views on the larger society. (I, 11). In response to questioning by the City's attorney, Mr. Donnelly stated that he does not consider Santa Claus and the Christmas tree to be religious symbols because, unlike the nativity scene, they are not referred to or described in religious documents such as the Bible. (I, 28). He further testified that he did not regard the nativity scene as merely a component of the entire Hodgson Park display. He distinguished it from the other decorations on grounds that the creche "attempted to tell a complete story in itself—the story of the birth of Christ." (I, 28–29).

---

**9.** The nativity scene occupies an approximately 10′ × 14′ area. Testimony was offered as to the amount of space occupied by the creche relative to that occupied by the rest of the display. (I, 91). However, the suggested comparison was unhelpful because the figures were not adjusted to reflect all the groundspace not covered by any building or figure. (I, 118–19).

**10.** Plaintiffs' complaint challenged the allegedly religious nature of some of the music broadcast over this system. No evidence was presented on this issue and the Court regards the point as abandoned.

The other plaintiffs, George Kriebel, Robert Goodwin, and A. Gregory Frazier, have all stated[11] that Pawtucket's nativity scene represents to them a religious display depicting the birth of Christ. Furthermore, they view the City's erection of the creche as demonstrating the City's support for the Christian religion. Finally, these plaintiffs have stated that the City's erection of the nativity scene has offended their interest in the separation of church and state.

Steven Brown, Executive Director of the ACLU,[12] saw the creche twice in December, 1980. (I, 43). Like Mr. Donnelly, he regarded it as a religious symbol which, by its inclusion within the City's display, represented official sponsorship of a particular religious viewpoint. (I, 43–44). He explained that he viewed the nativity scene as a clearly religious symbol despite being surrounded by non-religious figures. (I, 56, 63). Mr. Brown also noted that certain components of the nativity scene, such as the angels, the Madonna, the figures kneeling in adoration, had independent religious significance. (I, 53, 62). Although he agreed that the birth of Christ was a historical fact, he testified that the nativity scene signified to him more than merely historical fact. (I, 63). Mr. Brown was raised and educated in the Jewish faith. (I, 53).

Mr. Brown also testified about public reaction to the ACLU's prosecution of this lawsuit. His impression of this reaction was based on phone calls received by the ACLU at its office, see, e. g., (I, 41) and in response to a three hour call-in "talk show" in which Mr. Brown subsequently participated. It was also derived from Letters to the Editor published in the Providence and Pawtucket newspapers. (I, 49). Mr. Brown stated that some of the callers felt that the ACLU was "making a mountain out of a molehill" and that some regarded the display as secular in nature. (I, 52).[13] However, he felt that most people did not regard the religious element as incidental or minor. (I, 52–53). Rather, his impression was that the issue was not regarded as trivial (I, 61–62), and that many

11. These statements were made in affidavits, not in testimony at trial. However, the parties have agreed to accept the statements in these affidavits as evidence in this case.

12. Mr. Brown testified at length about the ACLU's commitment to civil liberties. The substance of this testimony is not recounted here, because it was relevant only to the issue of standing which the Court has resolved on other grounds.

13. Mr. Brown was permitted to testify about the contents of these phone calls and to introduce clippings of the Letters to the Editor despite the City's objection. The letters and conversations are hearsay, for they are out of court statements offered to prove that the declarants actually believed or felt about the lawsuit and/or nativity scene what they stated they did. However, they are admissible under Fed.R.Evid. 803(3) as an exception to the hearsay rule. See 4 J. Weinstein, *Evidence* § 803(3)[03]. The declarants' comments in the calls and letters were statements of their then-existing state of mind about the appropriateness of the lawsuit and the City's use of the creche. In accordance with the restriction in § 803(3) on use of statements of belief, they may not be considered as evidence that what the declarants believed or felt was indeed so. However, they may be used to show that members of the community believe these things, and these reactions are relevant to the question of divisiveness. *See* text *infra*.

Use of these items as evidence of the *effect* of the City's inclusion of the creche is a somewhat more difficult question, largely because it is not clear what the focus of the "effect" test is in cases where the challenged activity is the use of religious symbols. It seems unlikely that the legally significant effect is a purely subjective one, such that the outcome of the lawsuit depends on which side can produce the most witnesses who will testify about the effect the symbol had on them. On the other hand, symbols do not have meaning in the abstract; their effect *is* the message that they convey to the viewer. Therefore, a court could hardly divine the effect of a symbol without any reference to how people actually perceived it. This Court has concluded that the answer must lie somewhere between these two extremes. It has attempted to assess, in light of the nature of the symbol involved here, the time and manner of its use, and the background of the audience, how most people could reasonably be expected to interpret the message of the symbol and the City's reasons for using it. Because reaction to the nativity scene and the City's use of it *is* the issue, the phone calls and letters that reveal the feelings of some members of the community about the creche and the lawsuit can be used as evidence of effect without violating the restriction in Rule 803(3).

people—perhaps the clear majority—felt that the City had a right to sponsor and support the religious views of the majority. (I, 48–49, 64).

Former Mayor Lynch, testifying about the purpose of the Hodgson Park display in general, stated that community morale was one of the principal reasons for the City's sponsorship of the Christmas display. (II, 76). He likened it to the City's Fourth of July, Memorial Day, and Veterans Day festivities, the other main "cultural and traditional" events that the City sponsors. (II, 83–84). He also emphasized the importance of the Hodgson Park display to the downtown merchants, who rely heavily upon it as a draw for holiday shoppers. (II, 78–82). In furthering this commercial function of the display, Lynch testified, the City works with the downtown merchants' association in planning the size and timing of the display. (II, 78–79, 85–86). The utilization of Hodgson Park in this fashion is part of the downtown redevelopment effort. (II, 84–86).

When asked specifically about the role of the nativity scene, the Mayor initially stated that the creche was "central" to the City's Christmas experience for "three basic reasons": cultural and traditional, aesthetic, and economic. (II, 54–55). Later in his testimony, Mayor Lynch stoutly maintained that the creche was "incidental to" and "not the primary reason" for the overall display. (II, 77, 91). After some initial equivocation when questioned by plaintiffs on the point, (II, 53–54, 63–65), the Mayor responded to defense counsel's inquiry by stating that he would erect the display without the creche if necessary. (II, 76–77). He said that he "would assume and hope" that, even without the nativity scene, the display would still promote morale. (II, 91). The Mayor

concluded, however, that "most people" would be "upset" if the City had to remove the nativity scene. (II, 54). Noting that a creche has been displayed as part of Pawtucket's Christmas decorations for at least 40 years, (II, 62, 75), the Mayor stated that he had never received or heard of a complaint about it prior to this lawsuit. (II, 57, 62, 75).[14] Since the lawsuit, he has received over a hundred phone calls and numerous letters. (II, 57).

It is the Mayor's impression that people were shocked and outraged over the suit because it questioned what had been an accepted community tradition for 40 years. (II, 58, 60, 67–68). In the Mayor's view, people "had made the simple assumption that this would always be there because it was a good thing, and they're outraged again over the questioning of what is good for all." (II, 60). Criticizing the lawsuit for bringing into the community a divisiveness that "had never been seen" before in Pawtucket, (II, 65), the Mayor explained the public reaction by suggesting that people "thought it was very small of anybody to question what had been accepted by the community" for so many years "as a good thing." (II, 67–68).

After the lawsuit was filed, the Mayor held a "press conference" at Hodgson Park. (II, 55). A podium was set up specifically for the event in front of the nativity scene. (I, 117–18; II, 55–56). There had never before been a press conference at the display. (II, 75). The subject of the gathering was this lawsuit. (*Id.*). The Mayor led the crowd of municipal workers and school children in caroling. According to newspaper accounts that were part of the Mayor's file and were introduced into evidence by plaintiffs without objection from the City,[15]

14. This testimony must be qualified somewhat by the Mayor's statement, made during the course of an interview with the Good News Paper, that the ACLU has requested removal of the creche from the City's display every year since the first year he became Mayor. *See* clipping in Pl.Ex. 12. The Mayor testified that he considered the report of this interview to be "a fine overall job." (II, 66). The Court therefore accepts its substantive accuracy.

15. Two of the Mayor's files, one filled with press clippings and the other filled with letters of support the Mayor had received, were produced at trial and offered by plaintiffs. Before ruling on their admissibility, the Court sought out defense counsel's position. Counsel responded that he had no objection to their introduction. (II, 71). On ascertaining that newspaper articles were included in the matter admitted, the Court specifically warned defend-

the press conference was more in the nature of a rally, with the Mayor talking emotionally about patriotism, freedom and the Pawtucket tradition of a nativity scene, and vowing to fight vigorously the ACLU's attempt to take Christ out of Christmas.

At some point after filing of the suit, the Mayor announced his intention to include a menorah in next year's display. (II, 73). He explained at trial that he regards the menorah as "a very important thing to have as part of" the display, (II, 73), not only as a symbol of Judaism but also as "part of our culture, tradition, and an historical fact." (II, 74). He denied having said at the press conference, as reported, that this addition would be made "in honor of our Jewish brethren who have supported us in this." (II, 73).

The Mayor noted that at least one segment of the Jewish community in Pawtucket has called him to express support and to state that they regard the inclusion of the nativity scene as "a thing of joy and not a religious service or observance of any kind." (II, 76). He stated that he does not know of anyone ever having visited the Christmas display for the purpose of worship. (II, 77–78).

Two Pawtucket businessmen, active in promoting the commercial development of the downtown area, reiterated the Mayor's assessment of the importance of the Hodgson Park display to the Christmas shopping trade. Myron Stoller, a downtown retail merchant, noted that 25% of his annual business is done between Thanksgiving and Christmas and emphasized the importance of promotions such as the Hodgson Park display. (III, 1–7). He thought that the nativity scene added "absolutely nothing" to the impact of the display for commercial purposes. (III, 4, 7). Mr. Stoller, who is Jewish, does not object to the inclusion of the creche and has never heard any complaints about it. (III, 4–5). Dennis Moore, another local businessman and executive di-

rector of Downtown Pawtucket Revitalization, Inc., characterized the Hodgson Park display as "a key link in bringing commerce into the City." (III, 12). He agreed that the display's business impact would not be affected by removal of the nativity scene. (III, 14–15).

Each side presented expert testimony on the nature and effect of the nativity scene. Michael Werle, a licensed clinical psychologist about 40% of whose patients are children, (II, 19–24), testified about the important role that symbols play in a child's development of a self-image. (II, 25). He regarded the nativity scene as a very powerful symbol of worship, different from such secularized elements of the display as Santa Claus, Christmas trees and gift-giving. (II, 26–28). He felt that the symbol's impact on a child would be heightened by the magical quality of the display's bright lights and gifts of candy from Santa. In his opinion, a child of a non-Christian family, upon seeing the creche as part of a public display, would wonder whether he and his parents were normal. (II, 27–28, 39). He agreed that such self-doubt would arise only in children who understood the difference between public and private settings. (II, 31, 40–42, 44).[16] Furthermore, Dr. Werle felt that Pawtucket's inclusion of the creche in its Christmas display "reinforces [in Christian adults] an already prevalent attitude in our country that we are a Christian country." (II, 28). Dr. Werle believed that, by "encourag[ing] people who already confuse being American with being Christian," the City's practice breeds religious chauvinism and leads to the view that non-Christians are "somewhat less important and have less merit." (II, 28–29). Finally, he felt that nonbelieving adults would be insulted by the City-sponsored creche, but not "profoundly affected" by it. (II, 29).

Thomas Ramsbey, an ordained United Methodist minister and a college professor

ants that the files would be "in for all purposes" if they did not object. The City's counsel reiterated his acquiescence to admission. (II, 72).

**16.** Dr. Werle testified that he assumed that Hodgson Park was a public park because of the site of the display and its proximity to City Hall. (II, 48–49).

with a Ph.D. in the sociology of religion and religious ethics, (II, 93–94), testified as to the religious symbolism of the nativity scene. Dr. Ramsbey noted that, although there is no bright line between religious and non-religious symbols, an approach commonly used in the analysis of symbols defines "sacred" symbols as those which are clearly associated with a particular group. (II, 95–96). By contrast, "profane" (or secularized) symbols are not closely tied to particular groups; rather, they "belong" to everyone. (*Id.*). In contrast to the other elements of the Hodgson Park display, which he does not consider "sacred," (II, 105–06, 108–09), Dr. Ramsbey regards the creche as a very sacred religious symbol of Christianity. (II, 97, 114). He noted that the nativity scene depicts the birth of Christ as recounted in the Gospels of Matthew and Luke. The figures—including the animals—are in a worshipful pose; angels, regarded as messengers from heaven, are present. In his view, "the whole setting of the creche is a statement about the divinity, if you will, or the extraordinariness of the birth of this baby." (II, 98). Tying this to the theory that it is group affiliation which makes a symbol "sacred," Dr. Ramsbey pointed out that this belief about the special nature of Jesus Christ distinguishes Christians from other groups. (II, 114). He explained that the representation of the birth of Christ in the creche is a combination of historical fact and "the faith of the early church." (II, 98).

Dr. Ramsbey stated that the Methodist Church uses the creche as part of its worship and expressed dismay that the City had demeaned this Christian religious symbol by setting it in the midst of other, non-religious symbols. (II, 97, 104, 113).[17] On cross-examination, Dr. Ramsbey agreed that Christmas is in part a secular celebration belonging to the whole American culture. He insisted, however, that parts remained deeply religious and associated only with Christianity. (II, 109–12).

Defendants' expert, David Freeman, is a Professor of Philosophy at the University of Rhode Island and has done scholarly work in the fields of religious philosophy and religious symbolism. (III, 15–17). The essence of Dr. Freeman's testimony was that symbols "function contextually." (III, 33). Dr. Freeman testified that symbols have both objective and subjective dimensions. (III, 17–18). He emphasized that a religious symbol "doesn't occur in a vacuum, it occurs in a context." (III, 18). Defining a religious symbol as one that evokes "a religious response, an attitude of worship, of awe, a respect for the holy, a respect for the sacred," (*Id.*), Dr. Freeman stated that whether a symbol evokes a religious response "depends upon the attitude of the person viewing that symbol and where it's found." (III, 18).

---

**17.** Dr. Ramsbey was one of ten local clergypersons who, after the Mayor's press conference and the onset of the public furor this lawsuit generated, issued the following statement:

We clergy of several religious traditions wish to express a pastoral concern growing out of the controversy surrounding the display of a nativity scene with city funds in Pawtucket. Our concerns are several noted below. While the festivities, lights and generation of good will in this season have roots in both religion and secular tradition, the creche is a specifically religious symbol. Our country, while deeply influenced by the Judeo-Christian heritage, is not itself Judeo-Christian but is pluralistic, consisting of many rich religious traditions and recognizing the value of all. Government in our country, wisely recognizing the diversity of these traditions, was set up to steer clear of embracing any while protecting the religious freedom of all.

We as pastors have a responsibility to educate our people in the history of religious strife and the futility of imposing religious beliefs on the human conscience. The specifically religious observance of this holiday period belongs in our homes and in our churches and synagogues. Although there are public recognitions of this glad season, they should be confined to those symbols and traditions which are not identified with any one group. We call upon our public officials not to exploit the strong sentiments associated with religious festivals and divide majority from minority. Rather, we hope they will rise to a statesperson-like position and avoid the insensitivity of foisting upon others any specific religious traditions. In this way, the true joy of the season can be appreciated by and made meaningful to the widest diversity of people.

In Dr. Freeman's view, the purpose of the creche in the Hodgson Park display is "to help celebrate Christmas." (II, 27). He regards the nativity scene as "essential" in a Christmas display because otherwise "it would be like having a birthday party without knowing whose birthday it was." (III, 22–23). He likened the significance of Christ's birth to that of George Washington's. (III, 22). Furthermore, Dr. Freeman thought that the creche "put [people] into a Christmas mood where they would, in that context of the scene as it occurs, be more inclined to spend money in shopping." (III, 27). He summarized: "A symbol in a religious context would be a religious symbol and have a religious impact. A symbol in a nonreligious context will not be a religious symbol and will not have a religious impact." (III, 27–28). In Professor Freeman's view, a creche displayed in a church "would definitely be making a religious statement." (III, 32). In Hodgson Park, it is merely part of the whole: "[People] are not going there to worship or to pray, they're going there to shop, and the function the display would have for most people at least—the great majority, if not all—would seem to be to participate in the Christmas spirit, brotherhood, peace, and let loose with their money." (III, 19). Personally, Dr. Freeman does not attach any religious significance to the creche; indeed, he finds the Hodgson Park display aesthetically displeasing. He perceives a discord in lumping together Santa Clause, Christmas trees and "something which is obviously still in many peoples' minds of a religious origin." (III, 23).

Of the exhibits introduced by the parties, only three require separate discussion. These are the packet of Letters to the Editor collected by Steven Brown, the file of cards and letters received by former Mayor Lynch in connection with this suit, and the file of newspaper clippings kept by Lynch and containing many of the same Letters to the Editor that appeared in Brown's collection. Approximately 70 letters relating to the creche and/or the lawsuit are included in these exhibits. Only three do not endorse the position taken by the City or more particularly, by Mayor Lynch, in this case.[18] The letters expressing support vary greatly in style and content, but certain generalizations can be made.

The most recurrent comments appearing in over half the letters are that the birth of Christ is the essence of Christmas, and that the presence of the creche, as a symbol of this spiritual core, is necessary to preserve the true meaning of the holiday. Although about 10% of the letters expressed the view that the nativity scene represented simply the general moral and ethical aspirations of goodwill, peace, and love, the clear majority of writers regarded the dispute over the nativity scene as implicating religious beliefs and values. The Mayor's insistence on preserving the creche was lauded by many as a determination to "keep Christ in Christmas" and, more broadly, to keep God in American life. Several letters decrying the loss of a City "tradition" indicated that their writers viewed the creche's central role as portraying the religious aspect of Christmas. Some writers perceived the lawsuit as a confrontation between believers, whose right to express their faith was being threatened, and nonbelievers. In several letters, the writer expressed abhorrence for "the minority's" attempt to dictate to the "majority" what symbols could be displayed and revered. Some advocated allowing taxpayers or voters to decide how the City should spend their money. A few vigorously contested the desirability or even the possibility, of separating the religious and political spheres.

It would be inappropriate to quote portions of any of these letters because of the difficulty of selecting a truly representative cross-section. After reviewing them, however, the Court is firmly convinced that

---

**18.** Two of these letters encouraged the City to use non-sectarian symbols and expressions in its Christmas display so that the peace and goodwill of the season could be celebrated and shared by all without reference to denominational differences. The third letter questioned the ACLU's sense of proprieties in attacking the "innocuous" Hodgson Park display, but even more vehemently chided the Mayor for allegedly exploiting the issue for political gain.

they evidence a deep concern about and resentment for what most of the correspondents regarded as an attack on a cherished religious symbol. Although many letters criticized the ACLU as "petty," most writers did not mean that the creche was an insignificant part of the display. Indeed, the intensity of feelings evident in the letters belies any suggestion that the writers regarded this lawsuit as involving a trivial matter. As Mayor Lynch himself said, "I've never seen people as mad as they are over this issue." (II, 66). The asserted "pettiness" lay in the ACLU's decision to challenge what most regarded as the central symbol of Christmas rather than avoid the Hodgson Park area if the creche offended members of the ACLU. Overall the tenor of the correspondence is that the lawsuit represents an attack on the presence of religion as part of the community's life, an attempt to deny the majority the ability to express publically its beliefs in a desired and traditionally accepted way. In the Mayor's words, "The people absolutely resent somebody trying to impose another kind of religion on them . . . . I think the denigration, trying to eliminate these kinds of things, is a step towards establishing another religion, non-religion that it may be." (II, 66–67).

## I

■ At the outset; this Court finds that the plaintiffs Kriebel, Goodwin and Frazier have standing to litigate this case. Even before *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), recognized the

standing of federal taxpayers to challenge governmental expenditures on establishment clause grounds, municipal taxpayer standing had been permitted in this area. *See e. g. McCollum v. Board of Education*, 333 U.S. 203, 206, 68 S.Ct. 461, 462, 92 L.Ed. 649 (1948), citing *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1938). *Cf. Frothingham v. Mellon*, 262 U.S. 447, 486–87, 43 S.Ct. 597, 600–01, 67 L.Ed. 1078 (1923) (contrasting stake of federal taxpayer with that of municipal taxpayer for standing purposes). Thus, there is little doubt that Kriebel, Goodwin and Frazier, who pay taxes to Pawtucket, can challenge the City's maintenance of the creche.[19]

## II

The Supreme Court, in one of its major Establishment Clause opinions, noted wearily that "cases arising under the [Religion] Clauses have presented some of the most perplexing questions to come before this Court." *Committee for Public Education v. Nyquist*, 413 U.S. 756, 760, 93 S.Ct. 2955, 2958, 37 L.Ed.2d 948 (1973). The difficult problem is to define "the [elusive] line which separates the secular from the sectarian . . ." *Abington School District v. Schempp*, 374 U.S. at 231, 83 S.Ct. at 1576 (Brennan, J., concurring).

■ Before applying the familiar three-prong test prescribed by the Supreme Court for analysis of Establishment Clause problems, it is necessary to address two arguments made by the City which call into question whether this case presents an Establishment Clause problem at all.[20] Spe-

---

**19.** These plaintiffs submitted affidavits stating that they are now and have been during the time period relevant to this suit taxpaying residents of Pawtucket. The defendants have agreed that the Court may admit these affidavits into evidence.

**20.** At the threshold, it should be settled that the fact the government activity challenged in this case took place on private property does not foreclose an Establishment Clause inquiry. The City of Pawtucket clearly sponsored the Hodgson Park display. City workers planned it and erected it, Santa Claus arrived on a City fire truck to open it, the Mayor pulled the switch to light it, and the light and sound sys-

tems of the nearby City Hall were connected to it. Moreover, every element in the display, including the creche, was purchased and was owned by the City, was assembled and dismantled by City workers, and was lighted at City expense. That the portion of these expenditures attributable to the creche is relatively small does not vitiate any Establishment Clause problems. The use of even the most negligible amount of tax money to promote a religious belief or subsidize a religious activity contravenes the constitutional prohibition. *Stone v. Graham*, 449 U.S. 39, 42 n.4, 101 S.Ct. 192, 194 n.4, 66 L.Ed.2d 199 (1980) (per curiam); *Committee for Public Education v. Ny-*

cifically, the defendants contend first that the erection of the creche has not involved the City in religious activity to any significant degree. They claim that the presence of the creche in the Christmas display merely acknowledges a religious component of an important secular holiday that is celebrated by all Americans. Second, the City also argues that the nativity scene has become largely "secularized" so that its nature or function within the Hodgson Park display is not primarily religious. Each argument is considered in turn.

### A. Christmas as a Secular and Religious Holiday

The City argues first that "the dominant purpose and effect of the Christmas display and each component of that display (including the nativity scene) is to celebrate a national holiday in keeping with its *raison d'etre* ..." (Memo at 8). It continues, "The function of the nativity scene in the celebration of Christmas is really no different from the function of religion in the celebration of Christmas as a national holiday." (*Id.* at 9–10). It reasons, "Since the religious character of [Christmas] does not invalidate its observance because of an independent secular justification, a celebration of that holiday which includes a religious component ought not to constitute an establishment as long as the religious component is placed in its appropriate secular context." (*Id.* at 11). In the Court's view, this reasoning is born of a fundamental misperception of the meaning of the Establishment Clause.

Although no case to the Court's knowledge has specifically considered the legitimacy of designating Christmas as a national holiday, the courts that have considered the propriety of governmental participation in various displays and practices connected with Christmas have recognized the obvious fact that Christmas, as celebrated in 20th century America, has a decidedly secular dimension. *See, e. g., Florey v. Sioux Falls School Dist.,* 619 F.2d 1311, 1316 (8th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980); *id.* at 1325 (McMillan, J., dissenting); *Allen v. Hickel,* 424 F.2d 944, 948 (D.C.Cir.1970); *Citizens Concerned for Separation of Church and State v. Denver,* 508 F.Supp. 823 (D.Colo.1981). This is the Christmas whose central figure is Santa Claus and whose themes are the nontheological ones of goodwill, generosity, peace, and less exaltedly, commercialism. Yet it is equally obvious that for the many 20th century Americans who practice Christianity, there is another Christmas. This is the "original" Christmas whose central figure is Christ, the Son of God, and whose themes are the essentially theological ones of salvation and spiritual peace, renewal, and fulfillment. The City argues that the emergence of a secular dimension to Christmas has rendered the holiday's meaning merely vestigial.

■ The Court does not agree.[21] Christmas remains a major spiritual feast day for most sects of Christians. It has not lost its religious significance; rather, it has gained a secular significance. Janus-like, it is one holiday with two distinct and very different faces.

■ If government can, consistent with the Establishment Clause, declare and celebrate Christmas as a national holiday, it is precisely because of this dichotomous nature—that is, because the religious elements of Christmas can be separated out and the secular elements presented more or less in isolation. This is not an uncommon situation in the Establishment Clause area. Recognizing that religion is a real and per-

*quist,* 413 U.S. at 797 n.56, 93 S.Ct. at 2978 n.56.

**21.** The Court takes judicial notice that its latest figures put the Roman Catholic population in Rhode Island at well above 60%. The total Christian population is undoubtedly higher still. In light of this demographic characteristic of this area, the Court considers the City's assertion to be at best disingenuous. Evidence adduced at trial indicated that Christmas retains a profound religious significance for Christians. Certainly, Christmas has not lost its religious meaning for many of the City's residents who wrote to the Mayor expressing their support for his position.

vasive component in American life, the Supreme Court has never held that the presence of a religious element in an activity automatically places it beyond the purview of government involvement. As long as there are also strong secular elements, the government may involve itself with the activity *if* it limits itself to promoting only those elements. For example, although recognizing that "the place of the Bible as an instrument of religion cannot be gainsaid," *Abington School District v. Schempp*, 374 U.S. at 224, 83 S.Ct. at 1572, the Court has held that the Bible possesses an independent literary and anthropological value that makes it a permissible object of study in the public schools in the course of a curriculum designed to emphasize those elements. In an analogous area, the Court has held that sectarian colleges and universities have sufficiently separable elements that government can, with care, structure its programs to aid the latter without impermissibly advancing the former. *Tilton v. Richardson*, 403 U.S. 672, 680–82, 91 S.Ct. 2091, 2096–97, 29 L.Ed.2d 790 (1971).

■ In involving itself with one of these activities that possesses a dual significance, government must, however, be exceedingly careful that it indeed acts to advance only the secular elements. A case in point is *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (*per curiam*). There the Court held that a Kentucky law that required the posting of a copy of the Ten Commandments on the walls of public school classrooms was constitutionally infirm. Although accepting the possibility that the Ten Commandments could have a place in a properly oriented public school curriculum, the Court refused to accept a proffered secular purpose when the state merely posted the Commandments without making any real attempt to distill the secular significance of the Decalogue from its religious elements. Thus, the more dominant and widely recognized the religious element, the more fastidious must the government be in isolating and emphasizing its concern for only the nonreligious elements. Indeed, government has an obligation, if it would not contravene the Estab-

lishment Clause, to dissect the secular from the religious even in circumstances where private persons and organizations would perceive and treat the two as an amalgam. *See Allen v. Morton*, 495 F.2d 65, 73 n. 14 (D.C.Cir.1973) (opinion of Tamm, J.).

■ Applying these principles to the case of Christmas, it is this Court's view that a high standard of care is demanded of government when it seeks to "celebrate" this holiday. The secular and religious dimensions share a common origin and many people, whose holiday observance includes both aspects, may not perceive them as clearly demarcated. It is too late in Establishment Clause jurisprudence to suggest that the Government may endorse the Christian view of Christmas as a celebration of the birthday of the Son of God. The fact that a majority of citizens may not consciously draw a line between the Christian and the secular dimensions of Christmas requires that the government be all the more careful to draw a line, and a bright one, between the two, and remain on the clearly secular side.

The City apparently regards this construction of government's permissible role in dealing with an event having both significant secular and religious meaning as artificial and too restrictive. It seeks to avoid it by an argument that reduces in essence to this: (1) the secular dimension of Christmas is sufficiently developed to justify its observance as a national holiday; (2) because the City is permitted to celebrate the holiday, it must be permitted to celebrate all its component parts; (3) Christmas still has some religious component; (4) therefore, the City must be able to include that religious component, via the creche, in its Christmas display as long as it also includes the "justifying" secular elements.

■ In the Court's view, this argument is merely a bootstrap. The City relies on the presence of a secular dimension to give government a toehold and then argues that government, once there on the strength of the secular, has *carte blanche* to enter the allied religious dimension. This argument

would permit government to teach the religious message of the Bible because that document also has literary, social and historical value. *Cf. Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (school authorities could not read Bible verses without comment despite the secular value such verses might have). It would permit government to aid the sectarian instructional parts of church-affiliated colleges because those same institutions also teach secular subjects. *Cf. Tilton v. Richardson*, 403 U.S. at 682–84, 91 S.Ct. at 2097–98 (striking down provision that would have permitted federally-financed buildings to some day be used for religious purposes). It would permit government to declare Sunday a legal day of rest for religious reasons because there are also social welfare reasons for establishing a uniform day of rest. *Cf. McGowan v. Maryland*, 366 U.S. 420, 453, 81 S.Ct. 1101, 1119, 6 L.Ed.2d 393 (1961) (upholding Maryland Sunday closing law but warning that there might be a different result if it were shown that the purpose of a given Sunday law "is to use the state's coercive power to aid religion").[22] In the end, it would render the Establishment Clause a mere formula, for it is difficult to imagine any religious activity or object that would not have some saving secular qualities on which government could base its participation. *See McGowan v. Maryland*, 366 U.S. at 467, 81

S.Ct. at 1157 (Frankfurter, J., concurring) (noting that endowment of a church might be defended on theory that church inculcates moral concepts that make people better citizens). The identification of a secular dimension is not a license for government to range throughout the entire field with no thought for the secular or religious character of the area in which it moves. Rather, it is a delimitation of the bounds within which government must remain if it is not to trespass on forbidden ground.

█ In short, the Court finds that the mere fact that the Christmas holiday has an important secular element does not insulate government involvement in the religious aspects of the holiday from further review under the Establishment Clause.

### B. The Creche as a Religious Symbol

In contending that it has not violated the Establishment Clause, the City also argues that the inclusion of the creche in the Hodgson Park display is not primarily religious because the nativity scene in essence has become "secularized." As the Court understands this argument, the City is suggesting that most or all of the religious meaning that originally inhered in the nativity scene has been lost over time in the same way that other Christmas symbols, such as Santa Claus, have shed their religious meaning, or become "secularized."

---

**22.** The City has relied heavily on *McGowan v. Maryland* in its argument. It suggests a "strong similarity between the religious origins of the Christmas holiday and the religious origins of Sunday as a weekly legal day of rest." (Memo at 10). It then construes *McGowan* as meaning that "the religious origin of, and benefit to, religion in the Sunday laws did not disqualify their secular content; rather, their dominant secular character made their considerable religious impact incidental." (*Id.* at 11).

The City thus apparently regards *McGowan* as holding that the presence of a strong secular element is sufficient to vitiate any Establishment Clause problems by counteracting even a considerable religious element. The Supreme Court has rejected just such a reading of *McGowan.* Though set out in the course of a discussion of the "effect" strand of the *Lemon* test, the Court's explanation is useful here. In [*McGowan* ] Sunday Closing Laws were upheld, not because their effect was, first, to

promote the legitimate interest in a universal day of rest and recreation and only secondarily to assist religious interests; instead, approval flowed from the finding, based upon a close examination of the history of such laws, that they had only a remote and incidental effect advantageous to religious institutions. *Committee for Public Education v. Nyquist*, 413 U.S. at 783–84 n.39, 93 S.Ct. at 2970–71 n.39.

*McGowan* upheld the Sunday Closing Laws not because the presence of the secular justified the presence of the religious, but because the Court found the religious no longer present in any appreciable degree as a basis for such laws. *McGowan* is distinguishable from this case because the Court finds that the religious aspects of Christmas and of the creche are not merely a matter of historical origin; rather, the religious elements of both remain vital and significant to this day.

This argument requires the Court to examine the symbolism and meaning that attaches to the creche.

The nativity scene owned by the City of Pawtucket is not in any respect extraordinary. It depicts Mary and Joseph with the Christ Child lying in the manger, adoring shepherds, reverential kings bearing gifts, and angels announcing and rejoicing in the birth. Like other nativity scenes, it portrays the story of the birth of Christ as described in the gospels. It attempts to capture, through the poses and facial expressions of the figures, a sense of awe and worship. Although the birth of Christ is a part of history in the sense that a real person named Jesus Christ was born in Judea approximately 1981 years ago, it borders on the frivolous to suggest that the creche is merely a rendering of that historical fact.[23] As Dr. Ramsbey explained, the object we know as a nativity scene or creche combines history and faith. It not only recognizes the fact that a child named Jesus was born, but also makes a statement about the extraordinary nature of that child by presenting his birth as attended by angels, revered by shepherds, and sought out by kings.

The City nevertheless argues that the creche has lost much of its religious meaning in the same way that Santa Claus, Christmas trees, stars, bells, and other Christmas symbols have become secular. The Court finds these comparisons unpersuasive. It is generally accepted that the concept of Santa Claus can be traced to St. Nicholas, a bishop of the early Catholic Church. However, as one of plaintiffs' witnesses aptly observed, the modern day Santa Claus owes more to Clement Moore (and, one suspects, to present day television specials) than to the Fourth Century bishop. Santa Claus of today is a figure endowed with mythic trappings having no conceivable connection to his real-world progenitor—he is a jolly bearded figure who lives at the North Pole and emerges on Christmas Eve in a flying sleigh pulled by eight reindeer to distribute toys manufactured by elves by climbing down chimneys. No such drastic mutation can be found in the case of the nativity scene. The modern day creche retains its faithfulness to the biblical accounts which first inspired renderings of what Christians believe took place at Christ's birth.

As for other Christmas symbols—stars, (whose use presumably originated as a reference to the Star of Bethlehem), bells, (presumably a reference to church bells), and the Christmas tree, (whose pagan origins make its Christian significance especially murky)—it must be recognized that these are different kinds of symbols than the creche. To discern a religious import in the use of such common objects as stars, bells and trees, one must be able to associate them with the object or event that is of primary religious significance. The viewer must be able to recognize that the star represents the Star of Bethlehem which, according to the Bible, appeared on the night of Christ's birth and shone over the stable in which he lay; or that the bell represents the church bells that peal out on Christmas morning to call the faithful to worship; or that the lights on an evergreen tree represent the spiritual and everlasting light that Christianity believes Christ brought to a world in darkness. It may well be that, in view of the secular dimension that the celebration of Christmas has attained in modern life, most people no longer do, or even can, make the associations necessary to give these symbols a religious meaning.

23. Although the nativity scene goes beyond a strictly historical representation of the birth of Christ, the creche may be viewed as "historical" in the somewhat more specialized sense that we consider, for example, Greek myths to be historical. Beliefs about the origins of deities, such as the Greek belief that Athena, goddess of wisdom, sprang full-grown from the head of Zeus, are part of the history of a people. However, the Court does not understand the City to be using "historical" in this particular sense when it argues that the creche has an historical meaning because it is based on the historical fact that Jesus Christ was born.

However, unlike stars, or bells, or trees, the creche is not a common, ordinary object that attains a religious dimension only if the viewer understands that it is intended to connote something more than its facial significance, and possesses the key to unlock that secondary meaning. The creche is more immediately connected to the religious import of Christmas because it is a direct representation of the full Biblical account of the birth of Christ. That collection of figures does not have an everyday meaning that must be transcended to reach the religious meaning. For anyone with the most rudimentary knowledge of the religious beliefs and history of Western civilization, the religious message of the creche is immediately and unenigmatically conveyed.

In sum, the Court does not understand what meaning the creche, as a symbol, can have other than a religious meaning. It depicts the birth of Christ in a way that is not merely historical. It has not been so altered over the years as to relegate its religious connection to a matter of historical curiosity. It is the embodiment of the Christian view of the birth and nature of Christ. Unless that view has itself lost its religious significance, an artifact that portrays that view simply and unambiguously cannot be other than religious. The City suggests that the creche represents the non-sectarian ethical aspirations of peace and goodwill. Even assuming that this is an independent, secular meaning, the Court finds that it is subordinate to, and indeed flows from the fundamentally religious significance of the creche.[24]

The Court does not consider Dr. Freeman's testimony to undermine the conclusion that the creche is indeed a religious symbol for purposes of the Establishment Clause. Dr. Freeman appeared to regard the ability to evoke a response of worship as critical to a religious symbol. His view of symbols was primarily a functional one. If the symbol or artifact elicited a worshipful response in those who viewed it, it was "religious"; if that same symbol, in a different setting, did not prompt viewers to worship, it was not "religious" in that setting. Thus, Dr. Freeman regarded the creche as a religious symbol in a church, but maintained that it was not a religious symbol in the Hodgson Park display because it would not induce viewers to engage in worship. While the Court does not question that this may be a valid approach in the context of a sociological or anthropological study of symbols, the Court believes that this mode of definition is too restrictive for purposes of First Amendment analysis. *Cf. Crowley v. Smithsonian Institution,* 636 F.2d 738, 742 (D.C.Cir.1980) (court disagrees with expert's definition of "religion" in Establishment Clause inquiry).

"Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943). One may understand the symbol's message—so that the symbol has performed its job of communicating—without agreeing with it or responding to it. So

---

**24.** Justice Frankfurter, concurring in *McGowan v. Maryland,* emphasized:

If the primary end achieved by [the government action] is the affiliation or promotion of religious doctrine—primary, in the sense that *all secular ends which it purportedly serves are derivative from, not wholly independent of, the advancement of religion*—the [action] is beyond the power of the state. 366 U.S. at 466, 81 S.Ct. at 1157 (concurring opinion) (emphasis added).

The Court accepts that the desire for peace and goodwill is not essentially religious. However, it is one thing to convey that desire by a banner that reads simply "Peace on Earth" or "Sea-

son's Greetings", and another to convey it by a representation of the birth of Christ. The relationship of the latter to peace and goodwill is grounded in, and cannot be isolated from, religious belief about what the birth of this child means to the world. The only way the creche can advance peace and goodwill is if viewers are led to believe in and practice what Christ taught. *Cf. Abington School District v. Schempp,* 374 U.S. at 231, 83 S.Ct. at 1576 (Brennan, J., concurring) (government may not use essentially religious means to serve governmental ends where secular means would suffice).

long as the viewer possesses the background knowledge necessary to comprehend what the symbol is meant to stand for, the symbol does not lose its power as a communicative device simply by being taken out of its original, or optimal, context. The American flag flying on top of the Capitol represents our country; that meaning does not disappear for people when the flag is displayed in a baseball stadium or even in a museum exhibit of flags of the world. Similarly, for anyone familiar with modern history, the swastika represents naziism whether it appears on the armband of a World War II German uniform or is scrawled by vandals in 1981 on the side of an American building. The fact that the viewer may not feel a patriotic response on seeing the American flag or be moved to practice the tenets of naziism on seeing the swastika does not mean that he has not understood the message these symbols convey. By the same token, the creche does not lose its power to make a theological statement simply because it is removed from a Christian church, nor is it any less a religious symbol because it does not necessarily invoke a response of worship.

### III

The findings that the Christmas holiday has a significant religious aspect and that the creche is a religious symbol does not, of course, resolve the constitutional question. Government may involve itself in activities with a religious content as long as it does so carefully, in ways that avoid the harm that the Establishment Clause was intended to forestall. The Supreme Court has not yet given plenary consideration to a case challenging the use of religious symbolism. Perhaps the closest it has come is the recent case of *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (*per curiam*), in which the placard of the Ten Commandments posted in Kentucky's public classrooms had some aspect of a religious symbol. Cases involving state aid to religiously-affiliated schools and religious exercises within public schools, although not very helpful on their facts, do provide the basic method of analysis. To pass muster under the Establishment Clause, a statute must have a secular legislative purpose, its principal or primary effect must neither advance nor inhibit religion, and the statute must not foster an excessive government intanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d (1971). Recognizing that these factors are only guidelines to assist in ascertaining when the objectives of the First Amendment have been impaired, *Meek v. Pittinger*, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975); *Tilton v. Richardson*, 403 U.S. at 678, 91 S.Ct. at 2095, this Court must look to the purpose and effect of the City's inclusion of the creche in its Christmas display, and to whether this practice breeds administrative entanglement or political divisiveness.

### A. Purpose

The fundamentals of the purpose test are easily stated. The government action must "reflect a clearly secular ... purpose." *Committee for Public Education v. Nyquist*, 413 U.S. at 773, 93 S.Ct. at 2965. While the rationale offered by the governmental entity is entitled to deference, *Lemon v. Kurtzman*, 403 U.S. at 613, 91 S.Ct. at 2111, the Court must closely scrutinize the stated purpose, *McGowan v. Maryland*, 366 U.S. at 449, 81 S.Ct. at 1117, and ensure that the action was indeed motivated by legitimate secular aims. *E. g., Stone v. Graham*, 449 U.S. at 41, 101 S.Ct. at 193; *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973) (recognizing that "a legislature's declaration of purpose may not always be a fair guide to its true intent," but noting that the plaintiff had not suggested that the purpose was other than stated).

In addressing the purpose test, the City first argues that the nativity scene has no purpose that can be considered apart from the purpose of the Hodgson Park dis-

play as a whole.[25] It asserts that "[i]n applying the tripartite test to a government activity which contains a religious element, the appropriate focus is not on the religious element but on the activity of which it is a part." (Memo at 17–18). In the Court's view, this overstates the role that the context in which the religious component appears plays in the search for purpose. Surely, a court should look to the rationale underlying the entire program or activity of which the religious element is a part in order better to ascertain the reasons for inclusion of the religious element. The nature and relationship of the nonreligious components may go a long way toward verifying the purported secular purpose. *E. g., Walz v. Commissioner*, 397 U.S. 664, 672–73, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697 (1970) (in considering purpose of a tax exemption for churches, Court found evidence of secular purpose in fact that the charitable exemption included a broad range of educational, ideological, and service organizations). *See also id.* at 696–97, 90 S.Ct. at 1425–27 (Harlan, J., concurring). Thus, if a 16th century Italian hand-carved nativity scene is included in a City-sponsored museum display of Renaissance objets d'art, the context lends credence to an assertion that the purpose of including the creche was a secular one.

Recognizing this admittedly important role of context is not the equivalent, however, of suggesting that the only relevant purpose is that of the overall activity or program of which the religious element is a part. *See Valente v. Larson*, 637 F.2d 562, 567–68 (8th Cir. 1981), *prob. juris. noted,* —— U.S. ——, 101 S.Ct. 3028, 69 L.Ed.2d 404 (1981). Whenever the government employs a religious object or involves itself with a religious practice, the Establishment Clause demands that it account for its reasons in stepping beyond the secular sphere to accomplish its goals. *Cf. Abington School District v. Schempp*, 374 U.S. at 231, 83 S.Ct. at 1576 (Brennan, J., concurring) (government may not use religious means to accomplish its ends where secular means would suffice). Those reasons may indeed be the same as its reasons for employing secular objects or engaging in secular practices—as in the museum example above—but they must nevertheless be ascertained and scrutinized. The government cannot insulate its motives for using an object with religious significance from scrutiny merely by commingling it with a plethora of nonreligious objects.[26] "Indeed, on any other view, the constitutional prohibition could always be brought to naught by adding a modicum of the secular." *Everson v. Board of Education*, 330 U.S. 1 at 47, 67 S.Ct. 504 at 526, 91 L.Ed. 711 (Rutledge, J., dissenting).

**25.** The City argues that, in this case, "there is no significant difference between the first two parts of the [*Lemon*] test—purpose and effect. Whatever function the Hodgson Park Christmas display and its nativity scene component serve, is the function it is intended to serve." The City cites no authority in support of its position that the purpose and effect tests should be collapsed into one.

Effect is indeed an indicia of purpose. *See, e. g., Stone v. Graham*, 449 U.S. at 42, 101 S.Ct. at 193 (analyzing purpose in light of probable effect of State's action). However, as the Court understands the law, the two must be inquired into separately, for a neutral effect will not save an action with an impermissible purpose.

**26.** Although the point has not been expressly articulated in the cases, it has often tacitly been recognized. For example, the fact that school officials set out numerous rules governing the teaching of academic subject matter and the conduct of the school day does not limit the court, in a challenge to require prayers or Bible readings, to an inquiry into the general purposes of a prescribed curriculum or organized opening exercises. *See Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). *See also Stone v. Graham*, 449 U.S. at 41–42, 101 S.Ct. at 193. Similarly, a State that includes a prayer in an official publication cannot, by placing it among several nonreligious items, limit the court's scrutiny to the purpose of the publication as a whole. *See Hall v. Bradshaw*, 630 F.2d 1018 (4th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981) (prayer, scenic photos, and message from governor on reverse side of official highway map). *See also Allen v. Morton*, 495 F.2d 65, 68–69 (D.C.Cir.1973) (opinion of Tamm, J.) (looking both to purpose of Christmas Pageant of Peace as a whole and reason for inclusion of creche).

Although the purpose of the Hodgson Park display as a whole is relevant to the constitutional inquiry, the City may not gloss over the fact that the creche occupies a unique position in the display. Unlike every other element, the nativity scene "appears neither to have been divorced from [its] religious origins nor deprived of [its] centrally religious character by the passage of time." *Abington School District v. Schempp*, 374 U.S. at 278, 83 S.Ct. at 1601 (Brennan, J., concurring). *See McGowan v. Maryland*, 366 U.S. at 431, 81 S.Ct. at 1108 (using similar standard to evaluate Sunday Closing Law). Accordingly, it is necessary to establish why this religious symbol was included with all the secular symbols of Christmas.[27]

In his testimony, Mayor Lynch stated that the purposes for including the creche, like the purposes for the display as a whole, were both economic and cultural or traditional. (II, 54–55).[28] The first reason can be readily disposed of. The businessmen who testified on behalf of the downtown merchants readily agreed that the creche contributed nothing to the value of the display as a commercial draw. *Cf. Lowe v. Eugene*, 254 Ore. 518, 543, 463 P.2d 360 (1969) (cross erected in part to "enhance the commercial exploitation of the principal Christian holidays").

This leaves the purpose of "culture and tradition." The City argues that the presence of the creche in the display merely acknowledges the religious heritage of the holiday. (Memo at 15, 20). The City characterizes the creche as "part of the cultural symbolism of Christmas" and asserts that its inclusion in the display is simply "a straightforward recognition of a religious tradition." (*Id.* at 26).

The Court is aware that at least two courts, with little hesitation, have accepted as a valid secular purpose for the inclusion of a nativity scene in a public Christmas display the intention to "show how the American people celebrate the holiday season surrounding Christmas." *Allen v. Hickel*, 424 F.2d 944, 949 (D.C.Cir.1970); *Citizens Concerned For Separation of Church and State v. Denver*, 508 F.Supp. 823 (D.Colo. 1981). With due respect for the learned judges involved in those decisions, this Court finds that rationale extremely troubling, both in the way it places an apparently neutral, secular characterization on something that may well be far more religious than the label implies, and in the ease with which such a justification can be asserted by the sponsoring government.

▌ Particularly when a belief or practice has been common to the majority for a long time, it becomes easy to regard the belief or practice as a matter of culture or tradition and thereby imply that they have somehow attained a neutral, objective status. "Culture," "religion," "history," "heritage," and "tradition" are not mutually

---

**27.** The City points to testimony that the display would still be erected and would still serve at least its commercial and morale functions even without the creche and argues that this "can only mean that the nativity scene is not a primary purpose or effect of the display". (Memo at 25). For the reasons given in the text, this argument is misdirected. The question is not whether the display is erected primarily for the purpose of featuring the creche (although this would be relevant if it were indeed so), but rather whether the City's purpose in including the creche as part of the display was a clearly secular one. The Court readily accepts that the City had several purposes in maintaining a Christmas display. That some of these purposes can be served as well without the creche merely proves that they were not the reasons why the creche was included in the first place.

The Court also notes that the City has understated the perceived importance of the creche as a part of the City's Christmas decorations. At trial, the Mayor manifested a dogged determination to include the creche somehow, *see, e. g.* (II, 54). Such intense determination is not normally provoked by something perceived as a minor or incidental matter.

**28.** The Mayor also suggested that the creche was included in the display for aesthetic reasons. It seems unlikely that the creche, which by all accounts is not even well maintained, was erected principally for aesthetic purposes. The City does not press the point. In any case, the Court finds for reasons stated in the text that the City has sponsored the creche for reasons that are principally religious.

exclusive categories. The values, beliefs, and practices of groups in our society over time become our culture and traditions. However, the fact that a belief is held by sufficient members of society to render it part of our culture as a whole, or that a practice is observed for a sufficient length of time to give it the status of one of our traditions does not mean that the belief or practice ceases to be religious or to be identified with one group. Recitation of the Lord's Prayer has been a practice of many, if not most, Americans for generations. However, even though its time-honored and widespread observance may make it a tradition, and indeed even an element of our culture, it remains essentially religious and Christian. We cannot permit the labels "cultural" or "traditional," even when validly applied, to blind us to the nature of the object so described.

The Court perceives this danger in characterizing publically sponsored Christmas displays containing nativity scenes as mere depictions of how the "American people" celebrate the holiday. Santa Claus and Christmas trees have outgrown their religious beginnings and today are part of a nontheological ethos that can perhaps accurately be described as the "American" celebration of Christmas. In contrast, the nativity scene remains firmly tied to its religious origins and continues to express a fundamentally theological message about the nature of the child whose birth is there depicted. It represents the way *Christians* celebrate Christmas. Even though the majority of people in our country may be Christian and Christian beliefs and practices by their very pervasiveness have become an important part of our culture and tradition, it must be acknowledged that not every American is a Christian.

The Court is not suggesting that government may never take cognizance of a cultural or traditional element that is religious in character. It *is* suggesting that, in considering the constitutionality of govern-

ment displays that include a nativity scene, we must at least be frank in recognizing that that part of the display represents "culture" and "tradition" only in the sense that it represents a religious belief held by a substantial segment of our society for a long period of time.

The City effectively concedes that the role of the creche in the Hodgson Park display is to evoke the religious aspect of Christmas. It states that the function of the creche is "really no different than the function of religion in the celebration of Christmas," and characterizes it as representing the "religious heritage" or "religious tradition"[29] of the holiday. It contends, however, that it is merely acknowledging the presence of the religious element, rather than promoting it.

The line between "acknowledgment" and "promotion" is a fine one, especially when the religious beliefs or practices that the government would acknowledge are those held by the majority of its citizens. Moreover, although the Supreme Court has made it clear that the Establishment Clause does not require government to ignore the existence of religion in American life, it is equally clear that there are limits on the ability of government affirmatively to employ religious practices and objects to acknowledge religion's role. The opening of the school day with a prayer is forbidden even when the prayer is "based on our spiritual heritage," *Engel v. Vitale*, 370 U.S. at 425, 82 S.Ct. at 1264, and even though the practice might readily be explained as a "recognition" that many people and organizations traditionally begin their day with an invocation. Similarly, the government may not "acknowledge" the fact that the Bible is part of our religious heritage and has traditionally been regarded as inspirational by large portions of our society by reading verses, even without comment, in public schools. *Abington School District v. Schempp*, 374 U.S. at 224, 83 S.Ct. at 1572. Most recently, the Supreme Court has held

---

**29.** To the extent that the City uses "heritage" and "tradition" to suggest that the place of religion in Christmas is limited to an historical remnant with no real current vitality, the Court has already rejected that view.

that a state may not acknowledge the Ten Commandments as "the fundamental legal code of Western Civilization and the Common Law of the United States," by requiring the posting of a copy of the Decalogue in each public school classroom in the state. *Stone v. Graham,* 449 U.S. at 41, 101 S.Ct. at 193.

If the City can display the symbol that epitomizes the religious meaning of Christmas in recognition of Christians' belief that it is the day on which the Son of God was born, may it also sponsor a Catholic Mass in Hodgson Park on Christmas Eve in order to "acknowledge" that Midnight Mass is a part of our religious heritage and one of the traditional ways in which many Americans celebrate Christmas? *Cf. Gilfillan v. Philadelphia,* 637 F.2d 924, 930 (3d Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981) (construction of platform for Papal Mass). By posing such a question the Court does not mean to imply that this is an area in which one can paint with a broad brush. The making of fine distinctions is, for better or worse, the essence of Establishment Clause analysis. *Walz v. Commissioner,* 397 U.S. at 679, 90 S.Ct. at 1416. It does suggest, however, that considerable problems arise whenever government purports to "acknowledge" a religious practice or belief, particularly one to which the majority adheres, by the public presentation of sacred symbols, objects, or practices outside of such neutralizing contexts as museum displays, comparative religion or culture courses, and the like.

After careful consideration of the circumstances of this case, the Court concludes that it need not define the precise limits of Pawtucket's power to use a religious symbol to acknowledge the existence of religious beliefs or traditions because it finds that the purpose of including a nativity scene in the Hodgson Park display was not merely the neutral recognition that Christmas possesses a religious significance for some people. Rather, Pawtucket's use of a patently religious symbol raises an inference that the City approved and intended to promote the theological message that the symbol conveys. In the Court's view, nothing in the record undermines the reasonableness of drawing that inference here. Indeed, several statements and actions of the City and the Mayor support it.

First, the City has never attempted to disclaim, by means of a written notice or otherwise, any endorsement of the religious message that a creche—particularly when included as part of a Christmas display during the Christmas season—conveys. *Cf. Allen v. Morton,* 333 F.Supp. 1088, 1095 n.5 (D.D.C.1971) (government disavowed any affiliation with the religious content of creche in pamphlets and signs). Although this Court is not suggesting that such a disclaimer would necessarily cure any Establishment Clause problem, *see Stone v. Graham,* 449 U.S. at 41, 101 S.Ct. at 193, the City's failure to attempt to counter the reasonable inference of endorsement of Christian beliefs created by its ownership and display of the creche is evidence of its purpose.

Second, the only religious heritage and traditions that have been part of Pawtucket's official ceremonies and displays are those of the Christian majority of its citizenry. If the City's goal in "acknowledging" the religious heritage of Christmas is to enhance the viewer's knowledge of American life and culture, it is proceeding in a rather peculiar way when it exhibits only those elements with which most viewers are already familiar through their own experience. The Court is not proposing that the City create "an immense bulletin board whereon symbols of all faiths could be thumbtacked or otherwise displayed," *Fox v. Los Angeles,* 22 C.3d 792, 150 Cal. Rptr. 867, 587 P.2d 663, 665 (Cal.S.C.1978). However, if the majority's religious heritage and customs are the only ones that, in the end, are "acknowledged," the asserted neutral purpose is cast into some doubt.

Third, arguments that the City makes in defense of use of the creche also give an insight into the reasons for its presence in the Hodgson Park display. The City argues, "If government could celebrate a national holiday only by removing all of its

religious elements, the Establishment Clause would have achieved the very hostility toward religion which the Supreme Court has long and consistently disavowed as inimical to our constitutional tradition." (Memo at 26). It is hard to see how limiting the City's celebration of Christmas to the secular aspect that permits its designation as a national holiday in the first place is hostile to religion—unless by "hostility" the City means that a lavish celebration of the holiday which does not include some reference to Christ will aggrandize the secular dimension of Christmas to the detriment of the churches and religious groups who are struggling to "keep Christ in Christmas." A leitmotif in this litigation and the controversy surrounding it has been the assertion that to remove the creche from the Christmas display is to remove the guest of honor from his own birthday party. *See, e. g.* (II, 22–23) (testimony of Dr. Freeman); Mayor's interview with the Good News Paper in Pl. Ex. 12. This assertion, of course, is quite true when one is speaking of the Christian view of Christmas. However, it is not true when speaking of the secular aspect in which non-Christians participate and which government may observe as a national holiday.[30] Although Christians may deplore the growth of the secular dimension and deem it vital to retain the spiritual essence of Christmas as a religious observance of the birth of the Son of God, government may not assist in the fight to keep Christ in Christmas. To do so is to endorse a religious belief and aid in the promulgation of that belief.

The Court concludes that Pawtucket has tried to endorse and promulgate religious beliefs by including a nativity scene in its display. The City argues that "as part of the cultural symbolism of Christmas, the nativity scene does have a legitimate place which can be disparaged only in the course of an aggressive attack on all religious sym-bolism which in effect would amount to an establishment of irreligion . . . ." (Memo at 26). Although couching its position in terms of culture and tradition—a characterization which, as noted earlier, may not be permitted to conceal the fact that any cultural or traditional significance the creche possesses stems from its time-honored but not time-diminished place in the religious beliefs and practices of the Christian majority—the City, like most of its residents and neighbors who voiced their views of this lawsuit, regards the issue as whether Pawtucket will be forced to align itself with those who promote the secular, "irreligious" aspect of Christmas by deleting reference to Christ in its Christmas celebrations. This is the import of the Mayor's press conference promise to fight all the way a perceived attempt to take Christ out of Christmas. It is also the import of his statements, in the Good News Paper interview and on the stand, (II, 67), that attempts to eliminate the creche are attempts to establish a "non-religion." If the City indeed regarded the role of the nativity scene in the display as a neutral recognition of a cultural phenomenon devoid of any significant quantum of religious meaning or any endorsement of a religious message, it would not consider deletion of the creche a blow to religion. *Cf. Abington School District v. Schempp*, 374 U.S. at 224, 83 S.Ct. at 1572 (provision for alternative use of Catholic version of Bible is evidence that State did not regard readings as "nonreligious moral inspiration" or secular teaching tool).

In the Court's view, the City has accepted and implemented the view of its predominantly Christian citizens that it is a "good thing" to have a creche in a Christmas display, *see* (II, 60, 67–68) (Mayor's testimony), because it is a good thing to "keep Christ in Christmas." Irrespective of all the excellent religious reasons that may lead private individuals and organizations

---

**30.** The Court does not accept the suggestion that celebrating Christmas as the birth of Christ is no different from celebrating Presidents' Day as the birthday of Washington or Lincoln. Although Christ had an historical existence just as Washington or Lincoln did, his birth is marked because of his status as a religious leader, not a political one. Only by casting aside common sense and common experience can it be suggested that, in a country with a substantially Christian population, Christ is no different from George Washington.

and religious institutions to embark on such a crusade, there is no independent secular justification for government's doing so.[31] The Court concludes that the inclusion of the creche in the Hodgson Park display was not prompted by the "clearly secular purpose" that the *Lemon* test requires. Rather, the nativity scene was made part of the display in order to express the City's approval and endorsement of the religious message that the symbol conveys.

## B. Effect

. To pass Establishment Clause scrutiny, the governmental action must have "a primary effect that neither advances nor inhibits religion." *Committee for Public Education v. Nyquist*, 413 U.S. at 773, 93 S.Ct. at 2965. The Supreme Court has recognized that governmental actions may have more than one primary effect. *Id.* at 783–84 n.39, 93 S.Ct. at 2970–71 n.39. Although governmental activity that confers "some benefit" on religion is not necessarily unconstitutional, *Tilton v. Richardson*, 403 U.S. at 679, 91 S.Ct. at 2096, the existence of "some legitimate end under the State's police power" does not necessarily validate such activity. *Committee for Public Education v. Nyquist*, 413 U.S. at 783–84 n.39, 93 S.Ct. at 2970–71 n.39. Thus, action having the "direct and immediate effect of advancing religion" violates the First Amendment even though it may immediately and effectively promote legitimate secular ends. *Id.* See *Grendel's Den, Inc. v. Goodwin*, 662 F.2d 102, 104 (1st Cir. 1981) (rehearing en banc).

▆▆▆▆ The Supreme Court has stated that the Establishment Clause reaches not only the actual establishment of religion, but also the "*sponsorship*, financial support, and active involvement of the sovereign in religious activity." *Committee for Public Education v. Nyquist*, 413 U.S. at 772, 93

S.Ct. at 2965, *quoting Walz v. Commissioner*, 397 U.S. at 668, 90 S.Ct. at 1411 (emphasis added). The government need not overtly support particular sects or rites of worship. If government is " 'utilizing the prestige, power, and influence' of a public institution to bring religion into the lives of citizens," *Walz v. Commissioner*, 397 U.S. at 696, 90 S.Ct. at 1425 (concurring opinion, Harlan, J.) (quoting, in part, Justice Goldberg's concurrence in *Schempp*), the Establishment Clause is violated. Government must be neutral not only in its relations with different sects, but also in its relations with believers and nonbelievers. *Epperson v. Arkansas*, 393 U.S. 97 at 104, 89 S.Ct. 266 at 270, 21 L.Ed.2d 228. See *McCollum v. Board of Education*, 333 U.S. at 210 & n.6, 68 S.Ct. at 464 & n.6; *Everson v. Board of Education*, 330 U.S. at 15–16, 67 S.Ct. at 511.

▆▆▆▆ In order for governmental action to pass muster under the Establishment Clause, the government must dispel even the *appearance* of affiliation with the religious message, *Roemer v. Maryland Public Works Board*, 426 U.S. 736 at 747–48, 96 S.Ct. 2337 at 2345, 49 L.Ed.2d 179; see generally Tribe, *American Constitutional Law* § 14–9 at 844–45 (1978), for apparent sponsorship is as likely as intentional endorsement to breed religious chauvinism in those whose beliefs are seemingly favored as "good" or "true," and alienate those whose beliefs are seemingly dismissed as unworthy of official attention. For example, in both *Stone v. Graham* and *Abington School District v. Schempp*, the Supreme Court found that governmental action produced the effect of an official alignment with, and promotion of, a religious message even though neither case involved an affirmative attempt to use the religious items to proselytize. See 449 U.S. at 41–42, 101 S.Ct. at 193; 374 U.S. at 223–24, 83 S.Ct. at

---

31. This is not a case where government's action merely coincides with the tenets of a particular religion. See *Harris v. McRae*, 448 U.S. 297, 319, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980); *McGowan v. Maryland*, 366 U.S. at 442, 81 S.Ct. at 1113. The conviction that abortion is wrong or that a legally-mandated day of rest is desirable may exist entirely apart from any particular religious belief. The conviction that an object representing the biblical account of the birth of Christ will foster goodwill, peace, and brotherhood is born of, not merely coincident to, Christian beliefs. See note 24 *supra*.

1572. The intense and widely recognized religious element in the Ten Commandments *(Stone)* and the Bible *(Schempp)* required countervailing measures even stronger than Kentucky's written statement of secular purpose or Abington's presentation of biblical readings without comment or any other element of a religious service.[32] Similarly, in a recent lower court opinion, North Carolina's inclusion of a "Motorist's Prayer" among the various items on the back of its highway map was sufficient without more to effect an advancement of religion through the appearance of official endorsement of the prayer's content. *Hall v. Bradshaw*, 630 F.2d at 1020–21. Furthermore, Philadelphia's construction of a platform adorned with a cross for Pope John Paul's celebration of mass created the appearance of a municipal imprimatur on the religious message of the Papal Mass. This action violated the Establishment Clause even though city officials took no part in the papal rite or in the preliminaries of dispatching invitations and policing seating arrangements. *Gilfillan v. Philadelphia*, 637 F.2d at 931.

 These latter cases recognize that government sponsorship of religious beliefs can occur in ways far more subtle than endowing state churches or mandating acceptance of certain religious rites or tenets. It can take the form of "passive" use of objects or symbols that people perceive as having significant religious meaning in a manner that does not successfully shift the public perception to the object's nonreligious elements. Moreover, it is misleading to use the term "passive," for this suggests that governmental actions cannot shape public values and perceptions unless the government announces overtly its intention to make a value judgment. The very fact that it employs a religious symbol represents an active and deliberate incursion by government into the sphere of religion. If the effect of this endorsement is to be avoided, government must not merely be silent about the symbol. Rather, government must take affirmative steps to demonstrate that it has not chosen the symbol because it approves what the symbol represents.

The effect of Pawtucket's nativity scene must be analyzed in light of these general principles. This Court has discussed its reasons for concluding that the creche has not lost its religious significance and that it continues to make a strong and essentially theological statement about the nature of Christ. In light of this finding, the question is whether, irrespective of the City's purpose, the effect of Pawtucket's "passive" display of a nativity scene as part of its lavish Christmas decorations is the appearance of an official imprimatur on the religious message of the creche and on Christian beliefs, thereby aiding the Christian religion and violating the City's constitutional duty to maintain a neutral position *vis a vis* Christians, non-Christians, and non-believers.

The City suggests that such an effect has not occurred because: 1) prior to this lawsuit, people did not know of the City's connection to the Hodgson Park display; 2) the creche represents only a minor and insignificant part of the display; and 3) the creche is only one part of a display consisting primarily of secular Christmas symbols, and the City has made no affirmative attempt

---

**32.** In *Anderson v. Salt Lake City*, 475 F.2d 29 (1973), the Tenth Circuit upheld the placement on public ground of a monument containing the Ten Commandments, the Star of David, and other symbols. The precedential value of *Anderson* is, however, questionable.

First *Stone v. Graham* casts doubt on the conclusion that the Decalogue is no longer primarily religious in character. Second *Anderson* was decided three months prior to *Committee for Public Education v. Nyquist*, which held that governmental activity passes muster under the Establishment Clause only if its religious effect is "remote and incidental", regardless of its secular effects. The *Anderson* court found that the monument had both secular and religious effects, 475 F.2d at 34, and seems to have permitted the latter on the strength of the former. Such an approach appears inconsistent with *Nyquist*. *See* note 22 *supra*. Finally, the *Anderson* decision rested in part on the fact that the monument involved "no compulsion". 475 F.2d at 34. However, Supreme Court cases demonstrate that the absence of compulsion is not material in Establishment Clause inquiry.

to highlight or exploit its religious message. In such circumstances, the City argues, the effect is merely to "acknowledge" the religious heritage and traditions of Christmas without signalling any endorsement of the underlying beliefs. These arguments will be considered in order.[33]

The City's suggestion that, prior to this lawsuit, people did not associate the Hodgson Park display with the City borders on the frivolous. The Director of Parks and Recreation testified that the opening ceremonies at the Park are conducted by the Mayor, officiating in conjunction with Santa Claus, who arrives on a City firetruck. When the main switch is thrown, the lights at City Hall are illuminated simultaneously with those in Hodgson Park. The same music is broadcast at both places by a common sound system. Even though these factors[34] may not reveal to onlookers the precise financial arrangements underlying the display,[35] they surely indicate that the City has some significant part in its erection. The Court thus finds that people knew that the Hodgson Park display, including the nativity scene, was sponsored at least in part by the City long before the plaintiffs came on the scene.[36]

The City's second argument stresses that the creche occupies only a small portion of the groundspace in the Park, requires only a modicum of setup time, and represents only a minor percentage of the total cost and present value of the display. The City asserts that the nativity scene is thus a very minor part of the display. In the Court's view, however, the reasons offered by the City are unpersuasive because in ascertaining effect the Court must gauge how those who view the Hodgson Park display perceive it. First, visitors to the display could not possibly know the relative cost, value, or setup requirements of the various components. Second, carefully studying the photographs introduced into evidence and taking a view of the site, the Court concludes that, despite the small amount of ground covered by the creche, viewers would not regard the creche as an insignificant part of the display. It is an almost life sized[37] tableau marked off by a white picket fence. Furthermore, its location lends the creche significance. The creche faces the Roosevelt Avenue bus stops and access stairs where the bulk of the display is placed. Moreover, the creche is near two of the most enticing parts of the display for children—Santa's house and the talking wishing well. Although the Court recognizes that one cannot see the creche from all possible vantage points, it is clear from the City's own photos (see, especially, Def. Ex.C1) that people standing at the two bus shelters and looking down at the display

33. This Court's emphasis on the City's arguments expresses no opinion as to who carries the burden of proof on the question of effect. *Compare Allen v. Morton*, 495 F.2d at 88 (opinion of Leventhal, J.), *with id.* at 73 n.14 (opinion of Tamm, J.). Rather, these arguments simply present, in a concise fashion, the major elements of the "effect" issue in this case.

34. City officials testified that City workers put in approximately 600 hours assembling and dismantling the display. (I, 67). One can assume that such a flurry of activity in the heart of the downtown area would be observed by the public. However, the Court could find nothing in the record to indicate whether these workers wear uniforms that identify them as City workers.

35. To support its argument the City points to Dr. Werle's "false assumption" that Hodgson Park was public property. In the Court's view, the fact that people might reasonably mistake the Park for public property hardly supports the City's position. As long as governmental involvement sufficient to trigger the Establishment Clause exists, the fact that the public may think the display sits on public property only enhances the possible appearance of official endorsement. In short, what people *believe* the government is doing is the concern of the "effect" analysis in this type of case.

36. After the lawsuit was filed, the Mayor clearly revealed the City's affiliation with the display and, particularly, with the creche by his press conference/rally and other public comments. Thus, the extent of the City's sponsorship became well established during the time the 1980 display was up and will, of course, be common knowledge for future displays.

37. The City seems unwilling to accept the label "life sized". That is, however, the description that appears on the invoices produced at trial. *See* Pl. Ex. 5.

will see the creche centrally and prominently positioned.

■ Having disposed of the City's first two arguments, the Court finally must resolve whether Pawtucket's "mere" inclusion of a nativity scene in a display containing numerous secular symbols of Christmas violates the Establishment Clause. May Pawtucket constitutionally erect the creche as long as it does not attempt overtly to encourage persons to worship at or accept the religious message of, the creche? The Court finds that, despite its "passive nature," erection of the creche has the real and substantial effect of affiliating the City with the Christian beliefs that the creche represents.

Pawtucket contends that the inclusion of the creche does not have a primarily religious effect because the secular symbols in the display shift the viewer's attention away from the creche's religious symbolism. The Court disagrees that the secular context in which the creche is viewed is as neutralizing as the City's argument suggests. The secular and religious aspects of Christmas co-exist comfortably. Thus, when the City commingles secular and religious symbols in the display, it simultaneously evokes both dimensions of Christmas. Santa Claus is not rendered religious by his proximity to the creche; the creche is not rendered secular by its proximity to Santa Claus. In fact, by displaying the nativity scene in a setting with Christmas trees, bright lights, Christmas carols, and other Christmas symbols, the City has placed the creche in a setting *supportive* of its meaning. *See Allen v. Morton*, 495 F.2d at 89 & n.55 (opinion of Leventhal, J.).

■ Having found that the presence of the secular symbols of Christmas does not mute the religious message of the creche, the Court concludes that people who view the Hodgson Park display are not likely to regard the nativity scene as a mere "acknowledgement" that religious "heritage" and "traditions" are for some people a part of Christmas. The City's Christmas display is neither a museum exhibit where one goes expecting to see cultural artifacts, nor an educational course in which one expects to be taught about heritage and tradition. *Cf. Florey v. Sioux Falls School District*, 619 F.2d 1311 (8th Cir.), *cert. denied*, 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980) (upholding regulations governing the teaching in public schools about religious meaning and traditions of holidays).[38] The display is a celebration of the holiday, not an exposition about it.

Furthermore, the Court finds that Pawtucket has done nothing to shift the viewer's attention away from the creche's religious message or to counteract viewers' reasonable inference that the creche is there because the City supports that message and

---

**38.** The City relies heavily on *Florey* to support its position. *Florey* involved a facial challenge to regulations adopted in response to complaints that certain holiday exercises in the district's public schools were religious. The regulations appeared to be a good faith attempt to neutralize overtones of religious endorsement by specifying how schools could teach *about* religious aspects of holidays without teaching religion. At the time the Court of Appeals considered the case, the regulations had not been in effect long enough to produce a record of how theory was translated into practice.

In analyzing the applicability of *Florey* to this case, one must consider two points. First, *Florey* involved a school—a setting which, although especially delicate for Establishment Clause issues, is more conducive to instruction about culture and heritage than is a municipal holiday display. One goes to school expecting to learn about the world and the people in it. That is not one's expectation in going to Pawtucket's Christmas display. More important, the actual effect of applying the regulations in *Florey* was not known. 619 F.2d at 1319. It is only by looking at how religious symbols are actually used in the teaching process, including the relative amounts of emphasis given to Christian and non-Christian traditions, that one can determine whether a benign secular purpose has been successfully implemented to produce an effect only remotely or incidentally favorable to religion. *See generally* 619 F.2d at 1320–30 (McMillan, J., dissenting). In this case, the actual effects of the challenged practice can be observed, and, in the Court's opinion, are constitutionally defective irrespective of purpose.

wishes to promulgate it.[39] The City has not dispelled the appearance of approval of and affiliation with, the Christian view of Christmas.[40]

In view of the creche's unmuted religious message and the undispelled appearance of Pawtucket's affiliation with this message, this Court holds that the City's inclusion of a nativity scene in its Christmas display violates the Establishment Clause. Even if the creche does advance the nontheological goals of peace, charity, and goodwill, the Court finds that the appearance of official sponsorship of Christian beliefs that the creche conveys confers more than a remote and incidental benefit on Christianity. By using a religious symbol in a seasonal celebration of a holiday having religious significance for some groups, the City has given those groups special status. It has singled out their religious beliefs as worthy of particular attention, thereby implying that these beliefs are true or especially desirable. This aura of governmental approval is a subsidy as real and as valuable as financial assistance. Moreover, Pawtucket's use of the creche encourages in its citizens the belief that the Christian majority has the right to have "its" government reflect and express the religious beliefs that the majority regards as important. Were the notion that it is desirable for government to support the religious views of the majority to become so ingrained as to be accepted without scrutiny and defended without hesitation, a significant breach would be made in the constitutional citadel that protects our religious liberty.

## C. Entanglement

The final part of the Establishment Clause's tripartite test focuses on the degree and quality of governmental interaction with religion that the challenged activity promotes. See *Committee for Public Education v. Nyquist*, 413 U.S. at 794–97, 93 S.Ct. at 2976; *Lemon v. Kurtzman*, 403 U.S. at 615, 91 S.Ct. at 2112. The entanglement inquiry has two parts. The first, often referred to as "administrative entanglement," is implicated when the practice at issue brings government officials into close,

**39.** Pawtucket has included in the display no explanatory plaques, cf. *Allen v. Morton*, 495 F.2d at 69 & n.2, (opinion of Tamm, J.), expressly disclaiming any affiliation with the theological message of the creche. It has no ongoing practice of marking the religious heritage and traditions of other, non-Christian groups by means of lavish public displays, which *might* indicate that the City's goal was impartial and educational, as well as dispel what is now the appearance of blatant discrimination in favor of one religion.

The Court wishes to make it very clear, however, that it is *not* holding that the initiation of one or even both of these latter practices would necessarily be sufficient to meet Establishment Clause objections. As a practical matter, the Court anticipates that it would be very difficult to dissipate the appearance of endorsement that comes when government employs a religious symbol of the majority religion in a setting supportive of its meaning. The difficulties involved in giving comparable time, money, and attention to the customs and traditions of various religious groups, in order to avoid the appearance of partiality and, thus, sponsorship, would be formidable. Moreover, if Pawtucket embarks on a program of "acknowledging" divers religions' customs and traditions, would it be impermissibly favoring all religions over nonbelievers? What about the potential divi-

siveness caused by different groups demanding their share of City resources and recognition? In sum, such a "cure" may cause worse problems than the "disease".

**40.** This conclusion is reinforced by the opinions expressed in cards and letters of support received by Mayor Lynch after this lawsuit was filed. Although some writers found no religious content in the inclusion of the creche, most apparently believed that the presence of the nativity scene recognized and affirmed the Christian beliefs of the majority of the community.

The City argues strenuously that these letters are relevant only in assessing the effect of the *lawsuit*, not the effect of the *creche*. The Court believes that this argument ignores the commonsense connection between the two. Although the lawsuit clearly prompted the letters, and although many letters contain the writer's opinions about the plaintiffs' action, people's opinions about the lawsuit are a product of their feelings about and reactions to, the City's use of the creche.

Finally, it should be noted that Mr. Brown's testimony about the views of persons who called the talk show on which he appeared suggested a range of opinions very much like that revealed in the Mayor's letters.

ongoing contact with the affairs of religious institutions, thereby endangering the independence and integrity of both Church and State. *See, e. g., Lemon v. Kurtzman,* 403 U.S. at 615–20, 91 S.Ct. at 2112–14; *Meek v. Pittinger,* 421 U.S. at 369–72, 95 S.Ct. at 1765–66. The second part of the inquiry focuses on "the potential for political divisiveness." *Lemon v. Kurtzman,* 403 U.S. at 623, 91 S.Ct. at 2116. This half of entanglement analysis is based on the recognition that "competition among religious sects for political and religious supremacy has occasioned considerable civil strife, 'generated in large part' by competing efforts to gain or maintain the support of government." *Committee for Public Education v. Nyquist,* 413 U.S. at 796, 93 S.Ct. at 2977, *quoting Everson v. Board of Education,* 330 U.S. at 8–9, 67 S.Ct. at 507. This second component assesses the probability that the governmental involvement with religion at issue will encourage division of the polity along religious lines and infect robust political debate with an unhealthy strain of sectarian contentiousness. *Id.* 413 U.S. at 796 n.54, 93 S.Ct. at 2977. One need not look back into history to understand the seriousness of this latter concern about political divisiveness; the contemporary situation in several countries amply demonstrates the dreadful struggles and suffering that can result when government becomes a tool for executing religious goals and beliefs.

Unquestionably, administrative entanglement has not occurred in this case. The evidence shows that Pawtucket purchased the components and designed the layout of the Hodgson Park display without interaction with any of the community's churches or religious organizations. *Cf. Allen v. Morton,* 495 F.2d at 79–85 (opinion of Leventhal, J.). In the Court's opinion, however, Pawtucket's ownership and display of the creche does implicate the political divisiveness strand of the entanglement test.

The cases in which the Supreme Court has discussed potential divisiveness have involved new programs with little or no "track record" of operation. Thus, in these cases, the Court had to project the potential for divisiveness by considering such factors as the need for recurrent budgetary appropriations, *compare Lemon v. Kurtzman,* 403 U.S. at 623, 91 S.Ct. at 2116 (annual) *with Tilton v. Richardson,* 403 U.S. at 688, 91 S.Ct. at 2100 (single lump sum), and the nature of the constituency that would be concerned about the government's action, *see Tilton v. Richardson,* 403 U.S. at 688–89, 91 S.Ct. at 2100–01 (contrasting the "essentially local" nature of primary and secondary school problems with the "diverse and widely dispersed" constituency of colleges and universities).

This case is different. The creche has a "track record." As the City properly points out, a City-owned creche, has been displayed for forty years. Moreover, the practice has been marked by no apparent dissention. That calm history must be acknowledged in assessing the potential for divisiveness in the City's action.

The meaning of this history is ambiguous. Was the silence of the past forty years a healthy sign, indicating that members of minority religions did not feel slighted or alienated by the practice and had no desire for "equal time" for their religious holidays and symbols? Or, was the silence an unhealthy indication of the fear of angering the predominantly Christian majority? In short, was it the product of a pragmatic calculation that enduring one religious symbol celebrating one Christian holiday was a small price to pay for harmony among the townspeople?

The community's reaction to the filing of this lawsuit lends considerable plausibility to the latter interpretation. The City suggests that a "fair representation of the public concern is that it was directed at a perceived attack upon the symbolism of Christmas which is generally viewed as a symbolism of goodwill and brotherhood." (Memo at 27). However, the Court has found that most of those who communicated their support for the Mayor were not defending a nonsectarian emblem of theologically neutral aspirations. Rather, the creche was championed as the essence of the "true" meaning of Christmas, the vehi-

cle by which belief in and dependence upon God could best be conveyed during the holiday season. Several comments explicitly linked display of the creche with the expression of the majority's faith in Christ and its desire to commemorate his birth, and castigated "minority" attempts to prevent government from reflecting the majority's will in this manner.

Furthermore, religious leaders have come forward and encouraged the City to confine its holiday celebrations to nonsectarian symbols. Other religious leaders have responded angrily, sometimes questioning the spiritual commitment of the first group. *See* clippings and letters in Pl. Exs. 11 & 12. The few persons who wrote Letters to the Editor urging removal of the creche encountered furious criticism, usually expressed in terms of religious views and convictions. Former Mayor Lynch mustered City employees for a show of support at the creche, leading the crowd in carols by suggesting that they sing "another one that apparently bothers people." Clipping in Pl. Ex. 12. In sum, the atmosphere has been a horrifying one of anger, hostility, name calling, and political maneuvering, all prompted by the fact that someone had questioned the City's ownership and display of a religious symbol.

A reasonable interpretation of this public reaction is that Pawtucket's practice of displaying a creche occasions no divisiveness *only* as long as it continues unquestioned. Once challenged, however, the veneer of peace and harmony is stripped away. The absence of religious dissension in Pawtucket over the past forty years does not mean that the governmental action has not produced a division along religious lines. It merely means that until the plaintiffs in this case had the temerity to challenge Pawtucket's official practice, the *potential* for divisiveness remained unrealized. When the challenge finally came, the atmosphere in Pawtucket became charged with religious controversy and polluted by the acrid fumes of religious chauvinism.

The Supreme Court has never held that the potential for political divisiveness is alone sufficient to invalidate a government's action under the Establishment Clause. It has emphasized, however, that this is a "warning signal" that the mandate of the First Amendment has been compromised. *See Committee for Public Education v. Nyquist*, 413 U.S. at 798, 93 S.Ct. at 2978. Viewing this warning signal of potential divisiveness in conjunction with its earlier findings of improper purpose and impermissible effect, the Court concludes that the Establishment Clause has been violated in this case.

## IV.

Having spent considerable time exploring what this case is about, the Court feels compelled to add a few words about what it is *not* about. It is not about an infringement of the right of Christians freely to express their belief that Christmas is the day on which the Son of God was born. This decision has nothing to do with the ability of private citizens to display the creche in their homes, yards, businesses, or churches. However, the right to express one's own religious beliefs does not include the right to have one's government express those beliefs simply because the believers constitute a majority.

Our form of government is grounded in the principle that the soundest course for our country is most likely that plotted by the majority of our people. However, the Bill of Rights is a cardinal exception to that principle, mandating that in a few, vital areas the demands of the majority must yield for the ultimate good of all. "We have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion." *Torcaso v. Watkins*, 367 U.S. 488 at 493–94, 81 S.Ct. 1680 at 1682–83, 6 L.Ed.2d 982, *quoting McCollum v. Board of Education*, 333 U.S. at 213, 68 S.Ct. at 466 (Frankfurter, J., concurring). We cannot have it both ways—a government that scrupulously honors each person's freedom of belief and yet publicly aligns itself with one particular set of beliefs. The endorsement of one is a

disparagement of others that were not chosen, and it becomes increasingly difficult to accord equal respect to what has been publicly marked as less worthy.

The First Amendment requires that government provide an atmosphere of intellectual and spiritual freedom of thought and expression. In such an atmosphere, beliefs that have the strength of truth will flourish of their own power. Religion may demand, and government may give, no more than this. "We are a religious people whose institutions presuppose a Supreme Being. Under our Bill of Rights free play is given for making religion an active force in our lives. But if a religious leaven is to be worked into the affairs of our people, it is to be done by individuals or groups, not by the Government." *Engel v. Vitale*, 370 U.S. at 443, 82 S.Ct. at 1273 (Douglas, J., concurring) (citations, quotation marks, and footnotes omitted).

This Court finds that by including a nativity scene in its Christmas display, the City of Pawtucket has violated the Establishment Clause of the Constitution. Therefore, it is hereby ordered that the City be permanently enjoined from continuing this practice.

So ordered.

