**CITIZENS CONCERNED FOR SEPARATION OF CHURCH AND STATE, Plaintiff,**

v.

**The CITY AND COUNTY OF DENVER, Defendant.**

**Civ. A. No. 80–DW–1661.**

United States District Court, D. Colorado.

Dec. 4, 1981.

Jonathon B. Chase and Mark J. Loewenstein, Boulder, Colo., for plaintiff.

Stan M. Sharoff and Darlene M. Ebert, Denver, Colo., for defendant.

MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This is a civil action in which Citizens Concerned for Separation of Church and

State (Citizens), an unincorporated association, seeks a declaratory judgment and an injunction to prevent the City and County of Denver (City) from displaying, storing, and appropriating public funds for a nativity scene which is part of the City and County of Denver's annual Christmas lighting display. The claim arises under 42 U.S.C. § 1983 and jurisdiction is based upon 28 U.S.C. § 1343(3). The plaintiff's principal contention is that the presence of the creche on the steps of the City and County Building violates the Establishment Clause of the First Amendment.

Plaintiff's motion for a preliminary injunction was heard in January of 1981 (Preliminary Hearing). At that hearing, both sides offered extensive evidence in support of their positions. Although consolidation as provided for in Fed.R.Civ.P. 65(a)(2) was neither agreed to by the parties nor ordered by the court, the admissible evidence received there may be considered in determining the case on the merits. Most of the evidence supporting this decision was introduced at the preliminary hearing. The history and facts of the case are adequately set forth in the opinion denying preliminary injunctive relief. *Citizens Concerned for Separation of Church and State v. The City and County of Denver*, 508 F.Supp. 823 (D.Colo.1981). That opinion is adopted as the final decision in this case with the following additions and corrections that were necessitated by the final hearing on the merits (Final Hearing) held in August, 1981.

■ This case is governed by the three part test for determining whether governmental activity violates the Establishment Clause of the First Amendment.

First, the [action] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [action] must not foster 'an excess of governmental entanglement with religion.'

*Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745. The application of this test to the facts of this case is discussed at length in the court's prior opinion.

## I. PURPOSE

The court remains convinced that City has shown a sufficient secular legislative purpose for its sponsorship of the display and the inclusion of a creche in that display. No re-examination of the court's decision on this subject is necessitated by the evidence adduced at the final hearing. Since the original decision in this matter, however, the United States District Court for the District of Rhode Island has reached an opposite conclusion on similar facts. *See Donnelly v. Lynch*, 525 F.Supp. 1150 (D.R.I. 1981). That decision was based in part on a finding that a creche is an exclusively religious symbol and that the scene "was made part of the display in order to express the City's approval and endorsement of the religious message that the symbol conveys." *Id.*, at 1174. On the basis of the evidence that has been introduced in this case, this court cannot make the same finding, with all due respect to the Rhode Island decision.

## II. EFFECT

The evidence introduced at the final hearing does, however, require a re-examination and expansion of that portion of the opinion which concerns the effect prong of the test. The focus of the effect prong is whether the "principal or primary effect" of the government's activity advances or inhibits religion.

At the final hearing, Citizens argued that the Supreme Court's decision in *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), changed the focus of the effect prong. In Citizens' view, the inclusion of a nativity scene in a city sponsored Christmas lighting display would violate the Establishment Clause if the display's tendency to advance or inhibit religion was more than remote or indirect. In support of that contention, Citizens cited footnote 39 of the *Nyquist* decision where the Court declined to determine the primary effect of the school aid program at issue *in relation to* secular objec-

tives. The government argued in *Nyquist* that the court must find a single principle or primary effect and find the school aid program unconstitutional only if that effect is to advance or inhibit religion. In this court's view, the Supreme Court did not intend to lessen the standard of impermissible effect by its decision in *Nyquist*. In fact, the standard which the Court applies in that case was the primary effect standard. *Nyquist, supra,* at 773–774, 93 S.Ct. at 2965–2966. The "metaphysical judgment" the Court declined to make in *Nyquist* was the determination of a single primary effect. It recognized that there may be more than one primary effect and that government action which has the "direct and immediate" or, as stated elsewhere in footnote 39, "the direct and substantial" effect of advancing or inhibiting religion also has that primary effect.

■ The difference between the standard urged by Citizens and that adopted by the court in this case may be more semantic than practical, but Citizens cannot prevail on a mere showing that the nativity scene in the City's display has only a remote or indirect tendency to advance or inhibit religion. Rather, it is required to show that the effect is direct and immediate.

In this case, determining the standard is easier than applying the facts to that standard. In the school aid cases such as *Lemon* and *Nyquist*, the government attempts to confer a tangible financial benefit on an educational institution. In cases of that sort, the determination of whether a primary or direct benefit is conferred upon a religion is comparatively easy. It is more difficult in the context of this case, where the benefit or detriment is conferred by the public display of what may be perceived as a religious symbol. Such a benefit or detriment is by its nature intangible and the determination of whether it is direct and immediate is, therefore, elusive.

Citizens maintains that the prohibited effect arises in the appearance of the government's endorsement of a particular religious persuasion. The court agrees that an endorsement by the City of a particular faith

through the display of a religious symbol could have a direct and immediate effect of advancing or inhibiting religion. The problem arises in determining whether the City's use of a nativity scene as part of a larger display constitutes such an endorsement: Is the test whether the court, viewing the matter objectively, perceives such an endorsement, or should the court be governed by the subjective perceptions of the scene's viewers? If the test is subjective, the issue is one of degree: How broadly must an endorsement of religion by the City be perceived before the religious effect becomes "direct and immediate?"

Citizens contends that the impermissible effect of advancing or inhibiting religion arises if any reasonable person perceives the display as an endorsement by the City of the Christian faith. The City argues that before a violation of the Establishment Clause can be found the consensus of the viewers must perceive the impermissible endorsement.

In the court's view, neither test advanced by the parties is completely appropriate. Requiring that a consensus of the community perceive the religious endorsement before the effect is impermissible does not provide adequate protection for members of the community who endorse a faith (or lack of faith) other than that of the majority. However, it seems equally clear that City does not directly advance or inhibit religion merely because a reasonable person or indeed a group of reasonable people perceive the City's display as an endorsement of religion. Reasonable people, as the evidence in this case illustrates, can find endorsement by the government of religion in ceremonies and traditions that the Supreme Court has stated, at least in dicta, do not violate the First Amendment. *Zorach v. Clauson,* 343 U.S. 306, 312–13, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952).

In reaching its decision in the case, the court will borrow elements of both possible tests. First, the court must determine in light of all the evidence in the case whether the message conveyed by the City's use of a creche is one of endorsement of a religion.

Secondly, recognizing that the City's display of a creche scene as part of the Christmas lighting display has been perceived by some reasonable people as an endorsement by the City of the Christian faith, the court must assess the reasonableness of that perception in light of the nature of the symbol involved, the circumstances of its use, and the number of viewers who are likely to share that perception.

### A. *The nativity scene as a religious symbol.*

The nature of the nativity scene as a symbol is the subject of some controversy. While it is unquestionably of religious origin the evidence adduced in this case demonstrates that it has "acquired a significance which is no longer confined to the religious life." *Florey v. Sioux Falls School District,* 619 F.2d 1311 at 1316 (8th Cir.). The United States District Court for the District of Rhode Island found the display of a nativity scene in similar circumstances unconstitutional largely because of its view of the nature of the symbol involved. *Donnelly v. Lynch, supra.* The court in that case premised its decision on two assumptions. First, that the celebration of Christmas can be compartmentalized into its distinctly religious and secular dimensions and secondly, that the nativity scene belonged exclusively to the religious dimension. The evidence in this case contradicts those assumptions.

At the preliminary hearing, Dr. Milligan, an expert on the origins of Christmas, testified that although in his view the nativity scene was a religious symbol, the secular and religious sides of Christmas have been intertwined throughout history and it is difficult to separate the two. With respect to the nativity scene itself, there was evidence in this case, similar to that received in *Allen v. Morton,* 333 F.Supp. 1088 (D.D.C.1971), that nativity scenes are "seen in department stores, commercial establishments as well as in public places to symbolize the celebration of Christmas, a national holiday." *Id.* at 1098. Ms. Samuelson, who testified as an expert on folklore and folk-

life, indicated that the nativity scene is being increasingly used in juxtaposition to the secular symbols of Christmas. Similarly, secular symbols are increasingly finding their way into creche scenes. In her opinion, the nativity scene as a symbol of Christmas and the holiday seasons has become so interwoven into our folklore and folklife that it has a significance apart from its religious origins. Professor Hargrove, an expert on American civil religion, testified there is no clear distinction between Christmas as a secular holiday and Christmas as a religious holiday. She expressed her opinion that the nativity scene was somewhere along the road to becoming a symbol of the American civil religion similar to prayers in legislative halls and the motto "In God We Trust" on coins.

The court does not suggest that the nativity scene has become "interwoven so deeply into the fabric of our civil polity" that its use by the state can never amount to a violation of the First Amendment. But, it also cannot agree with *Donnelly* that the nativity scene is so exclusively religious that its use by the state is per se objectionable. What the evidence in this case did show is that the nativity scene has been used sufficiently in secular settings, and has been sufficiently integrated into our nation's folklife that the message conveyed by its use as a symbol is ambiguous. It is both a religious symbol of the birth of Christ and a sign of the holiday season on a par with Santa and mistletoe. Its meaning derives from the context of its use and from the eye of the beholder.

### B. *The use of the nativity scene in the context of a secular display.*

The circumstances under which this nativity scene is displayed are adequately described in our earlier opinion. It is sufficient to say here that it is part of an overall Christmas display of traditional Christmas symbols of short duration and is displayed with equal prominence as such holiday favorites as Santa and Rudolph. The context of the display certainly serves to minimize the creche's importance as a religious sym-

bol and the testimony in support of that fact was convincing. *But see Donnelly*, at 1177.

### C. *The perceptions of the scene's viewers.*

There were two types of additional testimony presented at the Final Hearing on various viewers' perception of the display. The first type involved letters and petitions to the City admitted at the preliminary. hearing for the limited purposes of establishing that the City was on notice that various persons perceived the creche as a religious symbol. At the Final Hearing, plaintiff urged the admission of the letters under the state of mind exception to the hearsay rule, Fed.R.Evid. 803(3). Citizens contended that the letters were probative of the religious motivations of their authors. This request was initially taken under advisement and since the hearing, the court has reviewed the letters and has admitted them to the extent they reflect the authors' state of mind.

The letters received were overwhelmingly in favor of retention of the scene. The most common state of mind reflected in the letters was anger at what the authors viewed as an attempt on the part of a small minority with extreme views to dictate to the majority in a matter which is a valuable part of the City's traditions. By the court's tabulation approximately half of the letters do not mention religion at all. The remaining letters that do mention religion can be divided into three groups. The first group, which includes a significant number of letters, expresses a clearly religious motivation for the declarant's support of the nativity scene. The court accepts these letters as evidence that the authors view the nativity scene as an endorsement of their religious belief or, probably more accurately, that the removal of the nativity scene would be viewed by them as an endorsement by the City of a position inimical to their faith. The second group, while not clearly expressing a religious motivation behind their letters, do contain sufficient religious references to provide circumstantial evidence of the authors' state of mind leading to the same inference as the first group. The third category, which includes the petitions and all the form letters which were submitted, though clearly religious, were signed by someone other than the author and are not considered by the court to be reliable evidence of the signer's state of mind.

The letters referred to in the first two categories of religious letters include perhaps seventy letters and, of course, do not represent any sort of scientific sampling of a community. Very little can be generalized from these letters other than that there are some people in addition to those who testified in court who perceive the controversy which is the subject of this litigation as a religious one. They did not testify in court so the basis of their perception and the reasonableness of their perception cannot be assessed by the court. Nor can it be said that subjective perceptions have been shown to be so broad that the creche display has the direct and immediate effect of advancing or inhibiting religion.

The second type of testimony presented at the Final Hearing involved expert psychological evidence on the effect of the City's display of a nativity scene on non-Christian children. In the court's view, this testimony was inconclusive. Reaching that conclusion the court considered the background of the witnesses, their interest in the case, their lack of agreement, and the failure of plaintiff's witnesses to consider convincingly the secular context of the lighting display.

The plaintiffs also introduced evidence of a study performed on sixteen children between the ages of eight and fourteen who were enrolled in a Jewish religious school to assess the children's ability to distinguish between religious and non-religious symbols and their use on public and private property. The study did support the views of plaintiffs' expert that children in that age group recognized common religious symbols and can distinguish between public and private property. The study was not particularly helpful in describing the children's

subjective perceptions of the message conveyed by the City's lighting display because it failed to consider the context of the display. For example, in one part of the study the children were shown a small American flag, a small model of a traditional nativity scene, and a traditional mennorah. The children were then asked with regard to each symbol whether it would be right "to put a great big one of these" in front of various buildings—without taking into account that their perceptions might be different if the symbols were only part of a larger display including additional secular symbols.

The part of the study most relevant to this case was where the children were shown a picture of the nativity scene as it is displayed by the City and were asked what kind of building was shown in the picture and whether their parents would want them to go there. The results of this line of inquiry were also inconclusive. The majority of those asked either recognized the scene from media coverage of the local controversy or attached no significance to the scene. The remainder assumed that the building was a church and that their parents would not want them to go there. However, the City and County Building of Denver is a rather large building with a steeple-like structure on the top. Children or indeed adults who viewed the building for the first time might also assume it to be a church without any display in front of it.

After considering all the evidence, the court remains convinced that City's use of the nativity scene in its annual Christmas lighting display does not have the primary or the direct and immediate effect of advancing or inhibiting religion. In attempting to objectively view the display in its context the court concludes that the message conveyed is not an endorsement by the City of the Christian faith, but rather one of general celebration of the holiday season. Citizens has shown that there are a number of citizens of the City and County of Denver who perceive the scene as an endorsement by the City of the Christian faith. It has not been shown that that perception is so broad or inevitable that a direct and immediate effect of advancing or inhibiting religion results. The First Amendment does not require the prerogatives of government be limited by the sensibilities of its most sensitive or fastidious citizens.

## III. ENTANGLEMENT

The court will examine only briefly the third prong of the *Lemon* test which it considers to have been adequately treated in the earlier decision. Citizens argued at the final hearing that the court unfairly used the decision of the District Court for the District of Columbia in *Allen v. Morton* because it followed that opinion on the first two prongs of the *Lemon* test, but failed to follow that decision wherein it found a display of the nativity scene in the national Christmas display violative of the entanglement test. The court responds to that contention only to point out that in *Allen*, government officials sat on a governing board responsible for the display with professional clerics. This raised the problem of "administrative entanglement" where government officials are brought into close and continuing contact with the affairs of religious institutions. No such entanglement is involved in this case because the nativity scene is planned entirely by government officials without any assistance or involvement with religious figures or institutions.

Based on the foregoing, which along with the original decision in this case, shall constitute the findings of fact and conclusions of law.

IT IS ORDERED that the court finds in favor of the defendant and against the plaintiff, no cause of action. No costs are awarded.