Daniel DONNELLY, et al.,
Plaintiffs-Appellees,

v.

Dennis M. LYNCH, et al., Defendants-
Appellants.

No. 81–1856.

United States Court of Appeals,
First Circuit.

Argued April 7, 1981.

Decided Nov. 3, 1982.

William F. McMahon, Providence, R.I., with whom Spencer W. Viner, City Sol., was on brief, for defendants, appellants.

Sandra A. Blanding, Warwick, R.I., with whom Amato A. DeLuca, Warwick, R.I., Pawtucket, R.I., was on brief, for defendants, appellants.

Kenneth A. Sweder, Daniel D. Levenson, Gerald A. Berlin, Herbert H. Hershfang, Alexandra Moses, Alan Dershowitz, Leonard Zakim, Carl Axelrod, Susan Estrich, and Clayton Gillette, Boston, Mass., on brief for amici curiae, The Anti-Defamation League of B'nai B'rith and the American Jewish Congress New England Region.

Before CAMPBELL and BOWNES, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

The question is whether the City of Pawtucket's ownership and use of a life-sized Christian nativity scene as part of a city-sponsored outdoor Christmas display situated on private property violates the Establishment Clause of the First Amendment. The district court held that it does and permanently enjoined the City from continuing the practice. We affirm that determination.

The relevant facts and the arguments of the parties have been carefully and exhaustively detailed in Chief Judge Pettine's

* Of the Seventh Circuit, sitting by designation.

opinion at the district court,[1] and thus need not be repeated here. We turn directly to those issues raised on appeal which we think merit discussion.

## I. Standing

The district court opinion stated:

[T]his Court finds that the plaintiffs Kriebel, Goodwin and Frazier have standing to litigate this case. Even before *Flast v. Cohen*, 392 U.S. 83 [88 S.Ct. 1942, 20 L.Ed.2d 947] (1968), recognized the standing of federal taxpayers to challenge governmental expenditures on establishment clause grounds, municipal taxpayer standing had been permitted in this area. *See e.g. McCollum v. Board of Education*, 333 U.S. 203, 206 [68 S.Ct. 461, 462, 92 L.Ed. 649] (1948), citing *Coleman v. Miller*, 307 U.S. 433 [59 S.Ct. 972, 83 L.Ed. 1385] (1938). *Cf. Frothingham v. Mellon*, 262 U.S. 447, 486–87 [43 S.Ct. 597, 601, 67 L.Ed. 1078] (1923) (contrasting stake of federal taxpayer with that of municipal taxpayer for standing purposes). Thus, there is little doubt that Kriebel, Goodwin and Frazier, who pay taxes to Pawtucket, can challenge the City's maintenance of the creche.[2]

525 F.Supp. at 1162.

Defendants argue on appeal that the district court's analysis of standing is undercut by the Supreme Court's subsequent decision in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). They claim that *Valley Forge*, severely limiting federal and state taxpayer standing, leaves no room for a distinction between federal and state taxpaying status on one hand and municipal taxpaying status on the other. We do not agree.

At issue in *Valley Forge* was the transfer of a former military hospital, valued in excess of a half million dollars, to petition-er, a church-related college. The Department of Health, Education, and Welfare, pursuant to the terms of a statute enacted by Congress under the Property Clause of the Constitution, had declared the facility surplus real property and then permitted petitioner to acquire the property without making any financial payment because of a 100% "public benefit allowance" computed under the statute. Respondents, an organization dedicated to the separation of church and state, and several of its employees, brought suit to challenge the conveyance as violative of the Establishment Clause. The Supreme Court held that respondents lacked standing, within the meaning of Article III, as either taxpayers or citizens.

In concluding that respondents were without standing as federal taxpayers, the Court distinguished its earlier decision in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). As an exception to the *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), general rule disfavoring federal taxpayer standing, *Flast* had held that a federal taxpayer will be a proper party to allege the unconstitutionality of an exercise of congressional power under the Taxing and Spending Clause where the enactment exceeds specific constitutional limitations on the taxing and spending power. *Flast* thus permitted taxpayer plaintiffs to challenge certain expenditures of federal funds under the Elementary and Secondary Education Act of 1965 as violative of the Establishment Clause. Relying on *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), and *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), the Court in *Valley Forge* declined to interpret *Flast* as creating a broad right for taxpayers to challenge all federal bestowals of largesse for religious purposes.

---

1. *Donnelly v. Lynch*, 525 F.Supp. 1150 (D.R.I. 1981).

2. A footnote to the last-quoted sentence added: "These plaintiffs submitted affidavits stating that they are now and have been during the time period relevant to this suit taxpaying residents of Pawtucket. The defendants have agreed that the Court may admit these affidavits into evidence."

454 U.S. at 464 n.20, 102 S.Ct. at 765 n. 20. Rather the Court embraced a narrower reading of *Flast* and found the facts before it distinguishable inasmuch as they involved not congressional action under the Taxing and Spending Clause, but action of an executive department pursuant to legislation adopted under the Property Clause.[3] The Court concluded that respondents lacked standing, in effect holding that the alleged deprivation of the constitutional use of their tax dollars failed to state a cognizable personal injury different from the harm purportedly sustained by taxpayers generally.

In addition, the Court held that the respondents in *Valley Forge* could not claim standing simply by reason of their citizen status. It reasoned that the assertion of a personal constitutional right to a government that does not establish religion is insufficient to satisfy the requirements of Article III, at least in the absence of identifiable personal injury suffered as a consequence of the alleged constitutional error. The Court expressly noted that the psychological consequence presumably produced by observation of conduct with which one disagrees is not sufficient to confer standing even though the disagreement may be phrased in Constitutional terms and the litigant's interest in the Constitutional principle intense. Taking care not to retreat from earlier holdings that standing may be predicated on noneconomic injury, the Court distinguished various cases, including *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). *Schempp* had invalidated certain laws which required Bible reading in public schools. The Court in *Valley Forge* cautioned that *Schempp* cannot be construed to mean that any person asserting an Establishment Clause claim possesses a "spiritual stake" sufficient to confer standing. "The plaintiffs in *Schempp* had standing, not because their complaint rested on the Establishment Clause ... but because impressionable schoolchildren were subjected to unwelcome religious services or forced to

assume special burdens to avoid them." 454 U.S. at 464 n.22, 102 S.Ct. at 766 n. 22. The Court found that the respondents in *Valley Forge* failed to allege a comparable injury, or indeed any "*injury* of *any* kind, economic or otherwise, sufficient to confer standing." 454 U.S. at 464, 102 S.Ct. at 766 (emphasis in original).

■ The *Valley Forge* decision, and particularly its reading of *Flast*, may be fairly understood as a restrictive view of the scope of federal taxpayer standing. So too, certain approving references in the opinion to *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), a taxpayer suit challenging a state Bible reading statute which was dismissed for lack of standing, might arguably be interpreted as meaning that similar limitations on standing apply to state taxpayers. *See, e.g.*, 454 U.S. at 464, 102 S.Ct. at 764. We find no indication, however, that the majority in *Valley Forge* intended to overrule the long line of cases establishing that municipal taxpayers, in contrast to federal or state taxpayers, have standing to sue to challenge allegedly unconstitutional use of their tax dollars.

Nearly sixty years ago, the distinction was made clear in *Frothingham v. Mellon*, *supra*, the seminal decision on federal taxpayer standing. Justice Sutherland wrote for a unanimous Court:

The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this Court. *Crampton v. Zabriskie*, 101 U.S. 601, 609 [25 L.Ed. 1070].... But the relation of a taxpayer of the United States to the Federal Government is very different. His interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and

---

**3.** In our case, plaintiffs challenge direct expenditures which, though small in amount, in certain respects parallel the disputed expenditures in *Flast*.

the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

262 U.S. at 486–87, 43 S.Ct. at 601 (emphasis added). Later Supreme Court decisions, including those cited in the above quotation from the district court opinion, have expressed or impliedly acknowledged the persistence of this dichotomy. Most recently, Justice Brennan's dissent in *Valley Forge,* which was joined by Justices Marshall and Blackmun, and relevant portions of which were endorsed by Justice Stevens' separate dissent, repeatedly noted the vitality of the municipal taxpayer standing rule. Though the majority opinion took issue with various aspects of the Brennan dissent, *see, e.g.,* 454 U.S. at 464 n.20, 102 S.Ct. at 765 n. 20, it made no challenge to the dissent's interpretation of this line of precedent.

In short, we find no clear intent in *Valley Forge* to overturn the long-established rule of municipal taxpayer standing. If, as the dissenters in *Valley Forge* suggested, there is a logical or jurisprudential inconsistency between that rule and the reasoning of the majority in *Valley Forge,* it must be left for the Court to resolve on another occasion.

We conclude that *Valley Forge* did not alter the principle of municipal taxpayer standing plainly established by numerous prior Supreme Court decisions. This is the same course taken by at least one district court subsequent to the *Valley Forge* decision. *See Board of Education of Valley View Community Unit School District No. 365U v. Bosworth,* No. 81–C–3403 (N.D.Ill. Apr. 5, 1982). Accordingly, we hold that the district court did not err in finding that the plaintiffs had standing as municipal taxpayers to challenge the City's ownership and use of the creche.

We find it unnecessary to consider the individual plaintiffs' arguments that they have sustained non-economic injuries sufficient to confer standing or the argument of the plaintiff branch of the American Civil Liberties Union that it has standing to represent the interests of its members.

## II. Establishment of Religion

### A.

The district court's assessment of the merits began with its rejection of defendants' claims that no Establishment Clause problem was raised because a Christian "nativity scene has become [a] largely 'secularized' [symbol] so that its nature or function within the ... display is not primarily religious," 525 F.Supp. at 1163 (brackets added), and because, in any event, "the erection of the creche has not involved the City in religious activity to any significant degree," *id.* On the first point, the court reasoned that unlike other Christmas symbols such as a star, a bell, or a tree, which "attains a religious dimension only if the viewer understands that it is intended to connote something more than its facial significance, and possesses the key to unlock that secondary meaning," the "creche is more immediately connected to the religious import of Christmas because it is a direct representation of the full Biblical account of the birth of Christ," 525 F.Supp. at 1167; that while the creche may represent non-sectarian ethical aspirations of peace and goodwill that "independent, secular meaning ... is subordinate to, and indeed flows from ... [its] fundamentally religious significance," *id.* (brackets added); and that the creche did "not lose its power to make a theological statement" merely because it was erected amidst non-religious decorations in the City's outdoor display, *id.* at 1168. As to the other argument, the court concluded that although the Christmas holiday has gained secular significance, it "remains a major spiritual feast day for most sects of Christians," *id.* at 1163; that "[i]f government can, consistent with the Establishment Clause, declare and celebrate Christmas as a national holiday, it is precisely because ... the religious elements ... can be separated out and the secular elements presented more or less in isolation," *id.;* that the presence of a secular dimension to Christmas does not justify government entry into the religious dimension, *id.* at 1164; and that therefore the City's conduct could

not be dismissed at the threshold as insignificant. We find no error in the court's treatment of these points.

Having concluded that an Establishment Clause problem was raised, the district court proceeded to examine the City's conduct under the familiar tripartite test announced in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). There the Supreme Court stated that for a statute to avoid the prohibition of the Establishment Clause:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen,* 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster 'an excessive governmental entanglement with religion.' *Walz [v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)].

403 U.S. at 612–13, 91 S.Ct. at 2111 (brackets added).

The district court here found that the City's ownership and use of the outdoor nativity scene was unconstitutional under each of the three tests.

With respect to the first test, the City had chiefly argued that the purposes of including the creche in the display, like the purpose of the display as a whole, were economic and cultural or traditional. The court readily rejected the economic justification, based on testimony in the record by merchants that the creche contributed nothing to the value of the display as a commercial draw to shoppers. 525 F.Supp. at 1170. After more lengthy consideration, the court also concluded that the creche had not been included merely for cultural or traditional reasons as an example of how Americans celebrate the holiday, for it found that no attempt had been made to disclaim any endorsement of the religious message, and more importantly that the only religious heritage and customs acknowledged by the display were those of the Christian majority of Pawtucket's citizenry. *Id.* at 1172. The court expressly held that the City had "tried to endorse and promulgate religious beliefs by including a nativity scene in its display." *Id.* at 1173.

With respect to the effect test under *Lemon,* the court first found that "people knew that the ... display was sponsored at least in part by the City" and that "viewers would not regard the creche as an insignificant part of the display." *Id.* at 1176. Relying then on statements of citizens contained in testimony or exhibits concerning their opinions about or reactions to the use of the creche, *see id.* at 1178 n.40, and on the absence of evidence of any attempt to present the creche in a broad, neutral, education contest, *see id.* at 1177 and n.38, or "to shift the viewer's attention away from the creche's religious message," *id.* at 1177, the court concluded that "despite its 'passive nature,' erection of the creche has the real and substantial effect of affiliating the City with the Christian beliefs that the creche represents," *id.* The court wrote:

Even if the creche does advance the nontheological goals of peace, charity, and goodwill, the Court finds that the appearance of official sponsorship of Christian beliefs that the creche conveys confers more than a remote and incidental benefit on Christianity. By using a religious symbol in a seasonal celebration of a holiday having religious significance for some groups, the City has given those groups special status. It has singled out their religious beliefs as worthy of particular attention, thereby implying that these beliefs are true or especially desirable. This aura of governmental approval is a subsidy as real and as valuable as financial assistance.

*Id.* at 1178.

Finally, the court found that while administrative entanglement between government and religious organizations had not occurred, the City's ownership and display of the nativity scene engendered division of the polity along religious lines and thus resulted in excessive entanglement between

government and religion. Appraising the facts before it, the court wrote: "In sum, the atmosphere has been a horrifying one of anger, hostility, name calling, and political maneuvering, all prompted by the fact that someone had questioned the City's ownership and display of a religious symbol." *Id.* at 1180. The court acknowledged that the "Supreme Court has never held that the potential for political divisiveness is alone sufficient to invalidate a government's action under the Establishment Clause," *id.* at 1180, but found that it may properly be interpreted as a "warning signal" that the First Amendment has been compromised. Viewing this warning signal of political divisiveness in conjunction with its earlier findings of improper purpose and impermissible effect, the court concluded that the Establishment Clause had been violated.

### B.

Subsequent to both the decision by the district court and oral argument in this court, the Supreme Court decided *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), a case involving a challenge to a state statute which denied an exemption from certain registration and reporting requirements to religious organizations receiving more than half of their total contributions from non-members. In striking down the 50% rule as violative of the Establishment Clause, the Court made clear what theretofore had perhaps not been readily apparent, namely that: "the *Lemon v. Kurtzman* 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions ... that discriminate *among* religions." 456 U.S. at 252, 102 S.Ct. at 1687 (emphasis in original). To statutes, such as the one before it, effectively granting a denominational preference,[4] the Court found appropriate a test of "strict scrutiny," which requires invalida-

tion unless the provision in question "is justified by a compelling governmental interest" and "is closely fitted to further that interest." 456 U.S. at 246–252, 102 S.Ct. at 1684–1687. Though the lower courts in *Larson* had proceeded under the *Lemon* tests, the Supreme Court applied strict scrutiny analysis. It struck down the challenged 50% rule because even assuming that the state had shown a sufficiently compelling governmental interest in curbing abusive practices in charitable solicitation, the rule was not closely fitted to furthering the asserted interest. The Court noted that while application of the *Lemon* tests was not necessary to disposition of the case before it, "those tests do reflect the same concerns that [warrant] the application of strict scrutiny." 456 U.S. at 252, 102 S.Ct. at 1687 (brackets substituted). To that extent, the court observed that its analysis and result were consistent with application of the excessive entanglement test to the state statute.

### C.

■ *Larson* makes clear that because the City's ownership and use of the nativity scene is an act which discriminates between Christian and non-Christian religions it must be evaluated under the test of strict scrutiny. Though (as in *Larson*) the district court did not utilize this standard, we think it can be employed on appellate review (as the Supreme Court did in *Larson*) because of the thorough analysis in the district court's opinion, and because, at least on the present facts, the district court's negative resolution of the first *Lemon* test—with which we agree—foreordains the result under the identification of compelling governmental interest prong of strict scrutiny.

Specifically, the district court found that defendants, after fair opportunity to do so,

---

4. In *Larson,* the Supreme Court found that the 50% provision:

> effectively distinguishe[d] between 'well-established churches' that have 'achieved strong but not total financial support from their members,' on the one hand, and

'churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members,' on the other hand.
456 U.S. at 246 n. 23, 102 S.Ct. at 1684 n.23.

were unable to advance any legitimate secular purpose for inclusion of the creche in the outdoor display and that by such action the City in fact had "tried to endorse and promulgate religious beliefs." 525 F.Supp. 1173. We find no error in this part of the district court's analysis. That being so, it follows inexorably that defendants established no compelling governmental interest in erection of the nativity scene. If one is unable to demonstrate *any* legitimate purpose or interest, it is hardly necessary to inquire whether a *compelling* purpose or interest can be shown. We conclude therefore that the first prong of strict scrutiny test is not met, and of course find it unnecessary to address the second prong. The judgment of the district court must be affirmed.

We note that our result is consistent with the district court's finding—with which we agree—that erection of the creche had a primary effect of advancing religion and therefore was unconstitutional. However, we are unwilling to place much weight on the court's determination that the City's actions risked political divisiveness along religious lines. As the court noted, this factor alone has never been held sufficient to invalidate governmental action, and First Amendment scholars have questioned and criticized the political divisiveness strand of the entanglement test on historical and prudential grounds. *See* Gaffney, *Political Divisiveness Along Religious Lines:* The U.L.J. 205 (1980); Ripple, *The Entanglement Test of the Religion Clauses—A Ten Year Assessment,* 27 U.C.L.A. L.Rev. 1195 (1980); *but see Larson v. Valente,* supra, 456 U.S. at 252–255, 102 S.Ct. at 1687–1688 (1982) (discussing in dicta "risk of politicizing religion"). We find it unnecessary to rely on the political divisiveness analysis in the district court's opinion.

**5.** It perhaps bears noting that the court in *Citizens Concerned* apparently misread the district court decision in *Donnelly,* at least to the extent that it found that *Donnelly* held that a "nativity scene is so exclusively religious that its use by the state is per se objectionable."

### D.

Finally, we are aware that our decision is apparently at odds with a recent decision of the United States District Court for the District of Colorado. In *Citizens Concerned for Separation of Church and State v. City and County of Denver,* 526 F.Supp. 1310 (D.Col.1981) (hereafter "*Citizens Concerned*"), that court expressly declined to follow the district court opinion in the present case and held that the erection of a nativity scene as part of the City and County of Denver's annual Christmas lighting display did not violate the Establishment Clause. The court intimated that the difference in result was in part accounted for by the nature of the evidence adduced in the two cases. *See id.* at 1311, 1313. In any event, however, we think it sufficient to note that we have considered the reasoning in *Citizens Concerned* and, to the extent it is legally inconsistent with the present decision, find it unpersuasive.[5]

Accordingly, the judgment appealed from is AFFIRMED.

BOWNES, Circuit Judge (concurring).

I concur fully in all of the majority opinion but write separately because I believe the dissent is incorrect when it says that Christmas originated as a religious holiday. Celebrations on or near the 25th of December predate the birth of Christ. In the First Century, B.C., Romans celebrated December 25th as the Natalis Solis Invicti, a feast in honor of the Sun God, Mithras. December 17th through the 22nd was also a festive period for the Romans—this was Saturnalia, a period dedicated to Saturn, God of agriculture, and to the renewed power of the sun. During Saturnalia, slaves were treated as equals of their masters; and a townsperson, chosen by lot, was given the throne, to rule at his whim. Tra-

526 F.Supp. at 1313. The *Donnelly* decision left open various possibilities, such as government use of a nativity scene as part of a museum display, 525 F.Supp. at 1169, or in a truly educational context, *id.* at 1177 n.38.

ditions of feasting, visiting, drinking, gift exchanging, and revelling are rooted in these pre-Christian festivals. School vacations for midwinter celebrations are said to trace back to pre-Christian Rome.

Not until early in the Fourth Century, in 336 A.D., do historians find evidence of celebrations on December 25th commemorating the birth of Christ. The Bible gives no direct indication of the date of Jesus's birth. In fact, the eastern portion of the Roman Empire celebrated the birth and baptism of Christ on January 6th. Whatever the date of Christ's birth, however, celebrating that event was intensely opposed by some Christians. The Puritans, believing that the church should not sponsor anything not found in Scriptures, objected to the celebration of Christ's birth because such a practice had no Biblical prescription. They condemned the celebration as "popish" and a "wanton Bacchanalian feast." Baptists, Presbyterians, and Quakers also strongly opposed the religious observance of Christ's birth. On the other hand, Roman Catholics, the Church of England, the Dutch Reformed, and the Lutheran Church celebrated the occasion. In 1643 the English Parliament outlawed feasts of Christmas, Easter and other holy days. Not until 1660 were Christmas celebrations again legal.

The controversy over whether to celebrate Christ's birth raged in the New World as well. In 1613, Captain John Smith celebrated with a feast among the Indians. The Puritans, however, continued their studied refusal to accept Christmas as a holiday. In 1659, the Massachusetts General Court followed Parliament's lead and enacted a statute making the observance of Christmas Day, by absence from labor, or feasting, or in any other way, an offense carrying a five-shilling fine. Anglicans immigrating to Plymouth, Salem, and Boston gradually softened the severity of the laws concerning the celebration of Christ's birth. Their influence led to a repeal of the stat-

ute in 1681. In contrast to the Puritans, Episcopalians throughout the colonies celebrated Christmas as a traditional religious feast. In New York, the Dutch observed an extended holiday period, both religious and secular in nature. December 6th was Saint Nicholas Day for the Dutch, when the Saint was credited with bringing presents to the children. Eventually, due to Anglican influence, the date was shifted to the 25th of December.

Several factors are recognized by historians for the gradual acceptance of Christmas as a holiday. Immigration from Germanic countries, which celebrated Christmas as both a religious holiday and a folk celebration, was an important factor. The rise of Sunday Schools in the first half of the Nineteenth Century also promoted general acceptance of the Christmas holiday embracing the folk customs of the Christmas tree and Santa Clause. K.L. Richards, How Christmas Came to Sunday Schools. The writings of Charles Dickens are credited with having had a major role in Christmas becoming a day of festive celebration; in Scrooge's own words, "a good time; a kind, forgiving, charitable, pleasant time." Another important factor in the increasing acceptance of Christmas as a holiday was the first amendment, requiring the separation of Church and State. "Because of this, members of Puritan and Evangelical churches were less inclined to oppose secular celebration when it no longer symbolized the religious and political dominance of the Church of England." J. Barnett, The American Christmas, A Study in National Culture at 60 (1954).

During the 1800's, secular interest in the holiday spread rapidly. In 1827, an Episcopalian Bishop wrote: "The devil has stolen from us ... Christmas, the day of our spiritual redemption and converted it into a day of worldly festivity, shooting and swearing." J. Barnett at 6 citing W.W. Maross, The Episcopal Church 1800–1840 at 178. Advertisements appealing to the gift-

giving tradition of Christmas appeared in New York City newspapers as early as 1820, and, by the latter half of the Nineteenth Century, the secular folk aspects were well on their way to outstripping the religious aspect of Christmas.[1]

In 1836, Alabama became the first state to grant legal recognition to Christmas as a holiday. The United States Congress, in 1870, declared Christmas, New Years Day, and the Fourth of July as holidays in the District of Columbia. Congressional debate on this bill was notably lacking in any discussion of the religious nature of Christmas, or of any constitutional issue involved by recognizing the day as a holiday. The stated purpose of the bill was to give the District of Columbia the same holidays recognized by most of the states. Cong.Globe, 41st Cong.2d Sess. 4529, 4805, 4833, 4849, 4973 (1869–1870). Of course, we can only speculate as to the meaning of the lack of debate. Perhaps it is evidence of widespread recognition of the secular aspect of the holiday; or perhaps it was the result of insensitivity of the Christian majority to the non-Christian segments of our society. In 1885, Congress passed a joint resolution making Christmas a paid holiday for federal employees. By 1890, every state in the Union had acknowledged Christmas as a holiday.

This brief review of the history of Christmas reveals that it is a holiday with both secular and religious dimensions. Today's American Christmas is a result of the mixing of diverse folk customs and religious beliefs in the melting pot of the New World. Christmas has roots that are embedded deeply in the Christian religion; its roots also extend to folk customs and pagan rites that predate the birth of Christ.

The creche, however, is tied firmly to the Christian religion; it tells the story of the birth of Christ, the Son of God. Unlike today's Christmas holiday, the creche is not the result of the combination of folk culture and tradition. The creche is purely a Christian religious symbol; this is the distinction between the creche and Christmas as a holiday. It is a distinction of constitutional significance. Although the government may recognize Christmas as a holiday and even participate in some of its secular traditions, it may not participate in or promote the Christian celebration of Christmas. To view the creche as only one of the many symbols of the Christmas holiday season is to denigrate its religious significance and misinterpret the historical background of Christmas.

LEVIN H. CAMPBELL, Circuit Judge (dissenting).

As the nativity scene is prototypically symbolic of Christmas—and as Christmas is itself a legal holiday whose constitutionality is not here questioned—I think the court errs in holding that the display in a public park during the Christmas season of characters and animals associated with that scene constitutes "an establishment of religion" within the first amendment. Unassociated, as they were, with the performance of any religious rites, the figures did not "establish" religion in the context in which they were presented. They simply contributed to the message that the holiday they represented was at hand.

It must be borne in mind that this creche was but part of a larger display in the same location which included a talking wishing well, a Santa's house inhabited by a live Santa who distributed candy, trees of various sizes, reindeer, and 21 cutout figures including a clown, dancing elephant, robot and teddy bear. The whole melange, including the creche, was nothing more nor less than a potpourri of well-recognized Christmas symbols. Had a solitary creche been displayed in July, one might see it as designed to serve chiefly religious ends,

---

1. The primary historical sources for this brief exegesis are: R. Meyers, Celebrations: The Complete Book of American Holidays (1972); and J. Barnett, The American Christmas, A Study in National Culture (1954).

since there would then be no holiday with which it was particularly identified. But creches and Santas in December are as typically symbolic of Christmas as turkeys and Pilgrims in November are symbolic of Thanksgiving.

The root of the difficulty lies in the fact that Christmas originated as, and to some people continues to be, a religious holiday.[1] For that reason certain of its established symbols relate to myths bearing, for some, a religious meaning. In Webster's Third New International Dictionary, Christmas is defined as follows:

> An annual church festival kept on December 25 or by the Armenians on January 6 in memory of the birth of Christ, celebrated generally by a particular church service, special gifts and greetings, and observed in most Christian communities as a legal holiday.

Because Christmas memorializes the founder of Christianity and is a church festival, it might be argued that the state and national governments should not be allowed to recognize it at all. Such an argument—unlike, I submit, the court's present position—would at least be logically consistent. In my opinion, the two most logically consistent positions are as follows: either Christmas itself, because of its inextricably intertwined religious roots, cannot constitutionally be a national holiday, in which case displays of the type here in issue would also be unconstitutional; or else Christmas is constitutional, in which case all its relevant symbols, including those depicting the nativity, are likewise constitutional, *so long as*

displayed for the purpose of announcing the holiday.

No one has argued in this case that Christmas as a national holiday is itself unconstitutional. Chief Judge Pettine, it is true, wrote in his opinion below that if the creche is not declared unconstitutional, then Christmas itself might have to be declared unconstitutional. He would thus "save" Christmas by shearing it of all its religious trappings. This is a possible approach, but I wonder if it really works. It seems a little like maintaining a holiday known as "Washington's Birthday" while extirpating all reference to George Washington. Christmas, so long as called by that name, inescapably recalls the birth of the founder of Christianity. To "save" it by pretending to the contrary has an almost Orwellian twist. I do not think constitutional values are furthered by this kind of thinking.

The fact is, Christmas, with its clear religious as well as its secular roots, has become an ingrained part of our culture. Were one today to seek to make a national holiday out of such a church festival, constitutional objections might well prevail. But Christmas is water over the dam. And so, I would argue, are *all* its established symbols, including carols and creches. To retain the holiday but outlawing these ancient symbols seems to me an empty and even rather boorish gesture.[2] If creches are to be outlawed, so too should stars and carols. And surely, the name itself—Christmas, deriving from "Christ" and "mass"—should be the first to go if the Constitution requires the eradication of any and all religious connotations!

I think we should accept what seems obvious—that, for historic reasons, Christmas

---

1. I do not disagree with Judge Bownes that modern Christmas has many secular and pagan aspects besides. My point is not that symbols portraying the birth of Christ are the exclusive symbols of the season; far from it. My point is merely that such symbols are clearly and inescapably *a part* of the total symbolism of the holiday, and therefore cannot be deleted without committing an act of censorship against the holiday itself.

2. Although no more boorish, perhaps, than the City of Pawtucket's argument that the real purpose of the creche was to bring shoppers to town.

is a constitutionally valid part of our national life. In having so become, it allows like any holiday the display of its accepted symbols—that and no more. To the extent these carry religious as well as mythical connotations, they must when placed on public property, be shown in a manner limited to announcement of the holiday rather than of a religious celebration or the inculcation of religion. The first amendment would plainly not allow the city to pay for a Christmas mass in a public park or the like. But the nativity scene has merged into the accepted Christmas symbolism. When seasonally deployed without accompanying religious ceremonies or message, I do not think it can be said to establish religion, any more than would the piping in of carols or similar activities having a religious base which our society has come to accept as part and parcel of the Christmas season.

I would uphold the constitutionality of the Rhode Island display and reverse the decision below.